# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ONTARIO PROVINCIAL COUNCIL OF CARPENTERS' PENSION TRUST FUND, POLICE & FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, AND NORFOLK COUNTY RETIREMENT SYSTEM, Derivatively on Behalf of WALMART INC., | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2021-0827-JTL |
| S. ROBSON WALTON, GREGORY B. PENNER, STEUART WALTON, TIMOTHY P. FLYNN, THOMAS W. HORTON, MARISSA A. MAYER, DOUG MCMILLON, STEVEN S. REINEMUND, PHYLLIS HARRIS, and JAY JORGENSEN, | ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| WALMART INC., | ) ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: January 13, 2023
Date Decided: April 26, 2023

Gregory V. Varallo, Mae Oberste, & Daniel E. Meyer, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Mark Lebovitch & Edward G. Timlin, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Leslie R. Stern, Nathaniel L. Orenstein, & Steven L. Groopman, BERMAN TABACCO, Boston, Massachusetts; *Counsel for Police & Fire Retirement System of the City of Detroit and Norfolk County Retirement System*.

Ned Weinberger & Mark Richardson, LABATON SUCHAROW LLP, Wilmington, Delaware; David MacIsaac, LABATON SUCHAROW LLP, New York, New York; *Counsel for The Ontario Provincial Council of Carpenters' Pension Trust Fund.*

Raymond J. DiCamillo & John M. O'Toole, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Sean M. Berkowitz & Nicholas J. Siciliano, LATHAM & WATKINS LLP, New York, New York; Andrew W. Stern & Charlotte K. Newell, SIDLEY AUSTIN LLP, New York, New York; William M. Regan & Allison M. Wuertz, HOGAN LOVELLS US LLP, New York, New York; Frank R. Volpe, SIDLEY AUSTIN LLP, Washington, District of Columbia; *Counsel for Defendants and Nominal Defendant.*

**LASTER, V.C.**

Walmart Inc. operates over 5,000 pharmacies that dispense prescription opioids. Until April 2018, Walmart also acted as a wholesale distributor of prescription opioids. From 2006 to 2012 alone, Walmart distributed over five billion opioid pills.

Based on its involvement with prescription opioids, Walmart currently faces thousands of lawsuits from private litigants, state attorneys general, and the U.S. Department of Justice. In November 2022, Walmart announced that it had agreed to a $3.1 billion nationwide opioid settlement (the "Nationwide Settlement") designed to resolve substantially all of the opioid lawsuits pending in federal multidistrict litigation (the "Opioid MDL"), plus potential lawsuits by state, local, and tribal governments. Walmart has incurred millions of dollars in defense costs and suffered reputational harm.

The plaintiffs own stock in Walmart. They seek to shift responsibility for the harm that Walmart has suffered to the fiduciaries whom they say caused it. They maintain that the directors and officers of Walmart breached their fiduciary duties to the corporation and its stockholders by (i) knowingly causing Walmart to fail to comply with a settlement between the U.S. Drug Enforcement Agency ("DEA") and Walmart (the "DEA Settlement"); (ii) knowingly causing Walmart to fail to comply with its obligations under the federal Controlled Substances Act and its implementing regulations (collectively, the "Controlled Substances Act") when acting as a dispenser of opioids through its retail pharmacies, and (iii) knowingly causing Walmart to fail to comply with its obligations under the Controlled Substances Act when acting as a wholesale distributor of opioids for its retail pharmacies.

As to each of the three categories of alleged misconduct, the plaintiffs have advanced three species of claims: a *Massey* Claim, a Red-Flags Claim, and an Information-Systems Claim.[1] The *Massey* Claim asserts that Walmart's directors and officers knew that Walmart was failing to comply with its legal obligations and made a conscious decision to prioritize profits over compliance. The Red-Flags Claim asserts that a series of red flags put Walmart's directors and officers on notice of Walmart's noncompliance or potential corporate trauma, yet the directors and officers consciously ignored them. The Information-Systems Claim asserts that Walmart's directors and officers knew that they had an obligation to establish a monitoring system to address a core compliance risk, yet consciously failed to make a good faith effort to fulfill that obligation.

The defendants have moved to dismiss the plaintiffs' claims for failing to support an inference of demand futility. The plaintiffs argue that the demand is futile because the complaint alleges facts supporting a reasonable inference that at least half of the directors

---

[1] This theory has been called a "prong one" *Caremark* claim, but that sterile nomenclature carries little informational content, and when not immersed in a *Caremark* case, I have difficulty remembering which theory is prong one and which is prong two. In one decision, I called the prong one theory a "Reporting-Systems Theory" or a "Reporting-Systems Claim." *Collis*, 287 A.3d at 1176. More recently, I called it an "Information-Systems Theory" or an "Information-Systems Claim." *In re McDonald's Corp. S'holder Derv. Litig.* (*McDonald's Officers*), 289 A.3d 343, 359–60 (Del. Ch. 2023). Either works. As between the two, the reporting-systems label is narrower and could imply only humans reporting up the chain. Oversight systems should be broader and include technology. The more expansive label of information-systems therefore seems preferable. Traditionalists may stick to prong one and prong two. Lawyers communicating with me can assist my comprehension by using the more descriptive labels.

in office when the lawsuit was filed face a substantial threat of liability or, in the alternative, lack independence.

This decision denies the motion to dismiss as to claims relating to the DEA Settlement and claims relating to Walmart's compliance with its obligations as a dispenser under the Controlled Substances Act. The motion is granted as to the claims relating to Walmart's compliance with its obligations as a distributor under the Controlled Substances Act.

## I.     FACTUAL BACKGROUND

The facts are drawn from the operative complaint, the documents it incorporates by reference, and pertinent public documents that are subject to judicial notice.[2] At this stage

---

[2] The operative complaint incorporates by reference documents produced in federal proceedings involving Walmart. The operative complaint also incorporates documents filed with the U.S. Securities and Exchange Commission (the "SEC"). The court may consider both sets of documents at this stage of the proceedings. *See, e.g.*, *In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at *7 (Del. Ch. Dec. 17, 2013) ("Applying [Delaware] Rule [of Evidence] 201, Delaware courts have taken judicial notice of publicly available documents that 'are required by law to be filed, and are actually filed, with federal or state officials.'" (quoting *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 584 (Del. Ch. 2007))); *Aequitas Sols., Inc. v. Anderson*, 2012 WL 2903324, at *3 n.17 (Del. Ch. June 25, 2012) (taking judicial notice of a pleading filed in a related action); *Prather v. Doroshow, Pasquale, Krawitz & Bhaya*, 2011 WL 1465520, at *1 n.2 (Del. Super. Ct. Apr. 14, 2011) ("For purposes of the instant motion to dismiss, this Court takes judicial notice of the federal docket of the Pennsylvania litigation and the foregoing decision of the Court of Appeals for the Third Circuit."); *In re Career Educ. Corp. Deriv. Litig.*, 2007 WL 2875203, at *9 (Del. Ch. Sept. 28, 2007) ("When considering a motion to dismiss, the court also may take judicial notice of publicly filed documents, such as documents publicly filed in litigation pending in other jurisdictions." (footnote omitted)).

Citations in the form "Compl. ¶ —" refer to the paragraphs of the operative complaint. Citations in the form "Ex. [number] at —" refer to exhibits that the defendants

of the proceedings, the complaint's allegations are assumed to be true, and the plaintiffs receive the benefit of all reasonable inferences, including inferences drawn from the documents.

Before filing suit, the plaintiffs used Section 220 of the Delaware General Corporation Law to obtain books and records. Walmart certified that between the documents it produced and those it listed on its privilege log, "Walmart's production is complete with respect to every category of documents that Walmart is required to produce."[3] Given this certification, if the record lacks documentation relating to a particular event, and if it is reasonable to expect that documentation would exist if the event took place, then the plaintiffs are entitled to a reasonable inference that the event did not occur.[4]

---

filed with their opening brief in support of their motion to dismiss. *See* Dkt. 30. Citations in the form "Ex. [letter] at —" refer to exhibits that the plaintiffs filed with their answering brief. *See* Dkt. 40. Citations in the form "PSB Ex. [letter] at —" refer to exhibits that the plaintiffs filed with their supplemental brief. *See* Dkt. 64. Page citations refer to the internal pagination or, if there is none, then to the last three digits of the control number.

[3] Final Order and Judgment at 7, *See Police & Fire Ret. Sys. of the City of Det. v. Walmart, Inc.*, C.A. No. 2020-0478-JTL, Dkt. 39 (Del. Ch. Oct. 29, 2020).

[4] *See* D.R.E. 803(7) (treating as non-hearsay and permitting fact-finder to consider the absence of a record of a regularly conducted activity, such as board or committee meetings); *see also Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1119 n.7 (Del. 1994) ("[T]he production of weak evidence when strong is, or should have been, available can lead only to the conclusion that the strong would have been adverse."); *Smith v. Van Gorkom*, 488 A.2d 858, 878 (Del. 1985) ("It is a well established principle that the production of weak evidence when strong is, or should have been, available can lead only to the conclusion that the strong would have been adverse." (citing *Interstate Circuit v. United States*, 306 U.S. 208, 226 (1939) and *Deberry v. State*, 457 A.2d 744, 754 (Del. 1983))), *overruled on other grounds by Gantler v. Stephens*, 965 A.2d 695 (Del. 2009); *accord Young v. Red Clay Consol. Sch. Dist.*, 159 A.3d 713, 791 n.510 (Del. Ch. 2017)

4

The confidentiality agreement governing the Section 220 production included an incorporation-by-reference condition. Relying on that condition, the defendants submitted eighty-two exhibits with their opening brief, plus another five exhibits with their supplemental brief. The defendants relied on the exhibits to contest the account in the complaint.

The incorporation-by-reference doctrine does not enable a court to weigh evidence on a motion to dismiss. It permits a court to review the actual documents to ensure that the plaintiff has not misrepresented their contents and that any inference the plaintiff seeks is a reasonable one. The doctrine limits the ability of a plaintiff to take language out of context, because the defendants can point the court to the entire document. The doctrine does not change the pleading standard that governs a motion to dismiss.[5] If the complaint contains well-pled allegations that could support different interpretations, then the court must credit the plaintiffs' interpretation. If the record could support different inferences, and if the plaintiff seeks a reasonable inference, then the court must grant the plaintiff the inference.[6]

---

(quoting *Kahn v. Lynch* and *Smith v. Van Gorkom*); *Chesapeake Corp. v. Shore*, 771 A.2d 293, 300–01 & n.7 (Del. Ch. 2000) (same).

[5] *See, e.g.*, *In re CBS Corp. S'holder Class Acton & Deriv. Litig.*, 2021 WL 268779, at *18 n.257 (Del. Ch. Jan. 27, 2021 (collecting authorities).

[6] *See Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

Many of the documents in the record can support several reasonable interpretations or inferences.[7] At this stage of the case, the plaintiffs receive the benefit of their reasonable interpretations and inferences.

Walmart laid the foundation for the plaintiffs to seek damaging inferences by redacting documents extensively. In many cases, only a few words survive. The resulting documents indicate that a topic was addressed, but the redactions deprive the court of insight into the context, the substance of the discussion, and any decision that might have been made. For a typical document, one possible inference is that the substance of the discussion and any decision would favor the plaintiffs' theory of the case. Another possible inference is that the substance of the discussion and any decision would favor the defendants' position. At this stage, the court must draw the inference that favors the plaintiffs.[8]

In some cases, Walmart made partial-sentence redactions, purportedly for non-responsiveness. The court has acknowledged that when producing books and records, a

---

[7] *See, e.g.*, Ex. 6 at '035, '044–47; Ex. 39 at '330, '332, '336; Ex. 46 at '601; Ex. 49 at '822, '825; Ex. B at 8–9.

[8] *See In re McDonald's Corp. S'holder Deriv. Litig.* (*McDonald's Directors*), — A.3d —, 2023 WL 2293575, at *33 (Del. Ch. Mar. 1, 2023) ("When the documents from a Section 220 production contain gaps, a plaintiff can seek inferences about what the redacted material might say. A court can credit those inferences, and that outcome could be worse for the defendants than if the Company had produced the documents without redactions.").

company may redact "material unrelated to the subject matter of a demand."[9] Measured under that standard, a partial-sentence redaction is dubious, because it depends on the premise that the author incoherently injected an unrelated topic into an otherwise responsive sentence.[10] The partial-sentence redactions played into the plaintiffs' hands.

On many occasions, Walmart redacted or withheld documents for privilege. The Delaware Rules of Evidence provide that "[t]he claim of a privilege, whether in the present proceeding or upon a prior occasion, is not a proper subject of comment by judge or counsel" and that "[n]o inference may be drawn therefrom."[11] The parties have not addressed whether this rule applies only at trial or also at earlier stages, such as a motion to dismiss. To be safe, this decision assumes the rule applies and therefore does not speculate or draw inferences about the content of the privileged communication.[12]

In their briefs, the defendants argued that the existence of the privileged documents and passages showed that the Board and its committees received reports on compliance issues. That seems like a fair inference to draw, and this decision assumes that to be the

---

[9] *Okla. Firefighters Pension & Ret. Sys. v. Amazon.com, Inc.*, 2022 WL 1760618, at *13 (Del. Ch. June 1, 2022).

[10] *See McDonald's Officers*, 289 A.3d at 355 & n.2.

[11] D.R.E. 512(a).

[12] *See ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *39 n.300 (Del. Ch. July 21, 2017) ("Sprint withheld relevant materials on grounds of attorney-client privilege. Aurelius requested an adverse inference against Sprint in post-trial briefing, but this is improper."), *aff'd*, 184 A.3d 1291 (Del. 2018).

case.[13] What the court cannot do is draw the defense-friendly inference that the content of the discussions favored the defendants, such as by reflecting an assessment that Walmart's compliance efforts were on track. Another reasonable inference is that the content of the discussions favored the plaintiffs, such as by reflecting an assessment that Walmart's compliance efforts were off track. The passages and documents for which Walmart asserted privilege could inferably cloak reports that Walmart had not devoted sufficient resources to compliance, had failed to implement or was behind schedule in implementing key initiatives, and would not be able to fulfill its obligations without a significant investment of resources that would cut into profits.

Although this decision does not draw inferences from any of the passages or documents for which Walmart has asserted privilege, it does draw inferences from an *absence* of non-privileged documents containing discussions or decisions about the business issues necessarily involved in (i) taking the steps necessary to comply with the DEA Settlement and the Controlled Substances Act, (ii) responding to red flags of noncompliance, and (iii) assessing the effectiveness of the compliance efforts. Legal advice undoubtedly is an *input* into those discussions and decisions, but if directors and officers

---

[13] *See Conduent State Healthcare, LLC v. AIG Specialty Ins. Co.*, 2023 WL 2256052, at *5 (Del. Super. Ct. Feb. 14, 2023) (citing D.R.E. 512(a)) ("The parties were strictly instructed that information contained in the logs could be used for the sole and very limited purpose of demonstrating, for example, that a meeting took place on a certain date, who attended the meeting, and the general topic of the meeting.").

are doing their jobs, then there will be non-privileged discussions and decisions about what are inherently and ultimately business decisions (which the business judgment rule generally will protect). Walmart represented that its Section 220 production was complete, so when there are no indications of non-privileged discussions, the plaintiffs are entitled to an inference that the discussions and decisions did not occur.

## A.       Walmart And Its Governance

Walmart is a Delaware corporation with its principal place of business in Bentonville, Arkansas. Walmart operates three primary business segments: Sam's Club, Walmart International, and Walmart U.S. As of 2022, the Walton family controls approximately 47.51% of Walmart's voting shares, either directly or through Walton Enterprises, LLC and the Walton Family Holdings Trust.

Walmart has a board of directors (the "Board") charged with overseeing the business and affairs of the corporation. The Board's duties include "overseeing the Company's policies with respect to compliance with applicable laws and regulations and adopting policies of corporate conduct designed to assure compliance with applicable laws and regulations and to assure maintenance of necessary accounting, financial, and other controls." Ex. 4 at 3. The Board meets at least four times per year. *Id.* at 4.

The Board has established six committees: the Executive Committee, the Audit Committee, the Compensation and Management Development Committee, the Nominating and Governance Committee, the Strategic Planning and Finance Committee, and the

9

Technology and eCommerce Committee. *Id.* at 5. The Executive Committee and the Audit Committee are the most pertinent to this decision.

The Executive Committee "[i]mplements policy decisions of the Board" and "[a]cts on the Board's behalf between Board meetings." Ex. 80 at 28. The Executive Committee meets "as often as it determines to be necessary or appropriate." Ex. 70 at 50. The Executive Committee's Chairperson "may direct appropriate members of management and staff to prepare draft agendas and related background information for each Executive Committee meeting." *Id.* The Chairperson must approve the agenda and materials before they are distributed to the other committee members. *Id.* "At the request of the Board or as the Chairperson determines necessary, reports of meetings of the Executive Committee shall be made to the Board at its next regularly scheduled meeting." *Id.*

The Audit Committee oversees and monitors "compliance by the Company with legal and regulatory requirements." Ex. 5 at 1. The Audit Committee meets at least quarterly and reports to the Board. The Audit Committee meets "no less than annually" with Walmart's ethics and compliance executives "regarding the implementation and effectiveness of the Company's ethics and compliance programs." *Id.* at 8.

**B.      Walmart's Legal Obligations As A Dispenser Of Prescription Opioids**

Through its Health and Wellness Division, Walmart operates one of the largest pharmacy chains in the United States, with more than 5,000 retail pharmacies located in its Walmart and Sam's Club stores. The Health and Wellness Division has generated at least 8% of Walmart's annual revenues since 2011. Ex. 2 at 33. Through its retail pharmacies,

Walmart dispenses prescription opioids under a DEA license that requires compliance with the Controlled Substances Act.[14] In its public filings, Walmart acknowledges that its business depends on complying with its legal obligations. *See, e.g.*, Ex. 1 at 22.

The Controlled Substances Act establishes a closed system for controlled substances, in which everyone from the manufacturer to the physician to the distributor to the pharmacist must register with the DEA and fulfill statutory and regulatory obligations. Registered manufacturers may sell controlled substances only to registered distributors. Registered distributors may distribute controlled substances only to registered pharmacy dispensers. And a registered dispenser may dispense controlled substances only under a legitimate prescription written by a registered prescriber.[15]

As a "dispenser,"[16] Walmart must establish and maintain effective controls and procedures to guard against theft and diversion of controlled substances.[17] The regulations for dispensers include specific requirements that pharmacies must meet. A pharmacy must

---

[14] 21 C.F.R. § 1301.11(a).

[15] *See* 21 U.S.C. § 822.

[16] *See* 21 C.F.R. § 1300.01 ("Dispenser means an individual practitioner, institutional practitioner, *pharmacy or pharmacist* who dispenses a controlled substance." (emphasis added)); *see* 21 U.S.C. § 802(10) (a dispenser is "a practitioner who so delivers a controlled substance to an ultimate user").

[17] 21 C.F.R. § 1301.71(a); *see In re Nat'l Prescription Opiate Litig.* (*Opioid MDL Abatement Decision*), — F. Supp. 3d —, 2022 WL 3443614, at *29 n.71 (N.D. Ohio Aug. 17, 2022), *appeal pending*, *Trumbull Cnty. v. Purdue Pharma, L.P.*, No. 22-3753 (6th Cir.).

implement security measures to maintain control over its inventory of controlled substances (the "Inventory Control Requirement").[18] The security measures must enable the pharmacy to identify instances of loss or theft and notify the DEA.[19]

A pharmacist can fill only legitimate prescriptions for controlled substances. Under the Controlled Substances Act, a prescription is legitimate if "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."[20] A pharmacist has a responsibility not to knowingly fill an illegitimate prescription.[21] The prevailing professional standard requires that a pharmacist identify and investigate any red flags, such as large, repeat orders, early refills, or prescriptions from out-of-state prescribers.[22] Pharmacists must use their professional judgment and refuse to fill orders that they determine are suspicious, report the refusal to the DEA, and maintain internal records regarding red-flagged prescriptions (the "Refusal-To-Fill Obligation").[23]

---

[18] 21 C.F.R. § 1301.75.

[19] *Id.* § 1301.76.

[20] *Id.* § 1306.04(a).

[21] *See id.* §§ 1306.04(a) & 1306.06.

[22] "[D]ispensers of controlled substances are obligated to check for and conclusively resolve red flags of possible diversion prior to dispensing those substances." *See In re Nat'l Prescription Opiate Litig.* (*Opioid MDL Dismissal Ruling*), 477 F. Supp. 3d 613, 629 (N.D. Ohio 2020), *clarified on denial of recons.*, 2020 WL 5642173 (N.D. Ohio Sept. 22, 2020).

[23] *See* Compl. ¶¶ 9, 92–93.

12

A pharmacy-registrant like Walmart must (1) employ properly licensed pharmacists, (2) work collaboratively with the pharmacists to dispense controlled substances properly to avoid diversion, and (3) collect and maintain specific records and data regarding its dispensing activities.[24] The records that registrants must maintain are extensive (the "Recordkeeping Requirement").[25] For a dispenser, the Recordkeeping Requirement includes maintaining information on

> the number of units or volume [of controlled substances that are] dispensed, including the name and address of the person to whom it was dispensed, the date of dispensing, the number of units or volume dispensed, and the written or typewritten name or initials of the individual who dispensed or administered the [controlled] substance on behalf of the dispenser.[26]

Many of the red flags that the DEA expects pharmacists to examine are "very difficult, if not impossible, for a human pharmacist to identify consistently absent a system to aggregate, analyze, and provide feedback to the pharmacist about the prescription," because "some prescriptions are not suspicious on their face but raise bright red flags when compared with other prescriptions in a database."[27]

A pharmacy-registrant like Walmart must provide its pharmacists with the time and other resources necessary to carry out their obligations, including the Refusal-To-Fill

---

[24] *Opioid MDL Dismissal Ruling*, 477 F. Supp. 3d at 630.

[25] *See* 21 C.F.R. pt. 1304.

[26] *Id.* § 1304.22(c).

[27] *Opioid MDL Dismissal Ruling*, 477 F. Supp. 3d at 630.

13

Obligation. For example, a pharmacy-registrant may provide pharmacists with access to a computerized recordkeeping system so that the pharmacists can investigate red flags.[28] A pharmacy is not legally required to provide access to a computerized recordkeeping system—"[i]t remains true, however, that a pharmacy may not fill a prescription that it knows or has reason to know is invalid and may not remain deliberately ignorant or willfully blind of the prescription information it has (including computerized reports it generates)."[29] "Pharmacies may not do nothing with their collected data and leave their pharmacist-employees with the sole responsibility to ensure only proper prescriptions are filled."[30]

The Controlled Substances Act does not mandate strict compliance with its requirements. Substantial compliance is sufficient.[31]

---

[28] *See id.* at 629–31.

[29] *In re Nat'l Prescription Opiate Litig.*, 2020 WL 5642173, at *3 (N.D. Ohio Sept. 22, 2020).

[30] *Id.* (cleaned up).

[31] *In re Nat'l Prescription Opiate Litig.*, 2021 WL 3917174, at *3 (N.D. Ohio Sept. 1, 2021) (citing 21 C.F.R. § 1301.71(b)).

## C. The Order To Show Cause And Walmart's Response

On November 13, 2009, the DEA issued an order to show cause against a Walmart pharmacy in San Diego, California (the "Order to Show Cause"). Ex. A. The Order To Show Cause asserted that the San Diego pharmacy:

(1) improperly dispensed controlled substances to individuals based on purported prescriptions issued by physicians who were not licensed to practice medicine in California;

(2) dispensed controlled substances to individuals located in California based on Internet prescriptions issued by physicians for other than a legitimate medical purpose and/or outside the usual course of professional practice in violation of federal and state law; and

(3) dispensed controlled substances to individuals that [the San Diego pharmacy] knew or should have known were diverting controlled substances.

*Id.* § II. Walmart disputed the factual assertions and "disagreed with DEA's position that the DEA registration of [the San Diego pharmacy] should be revoked." *Id.*

Also in 2009, Walmart commissioned McKinsey & Company to conduct a risk assessment for the Health and Wellness Division. Ex. 6 at '037. Walmart has claimed the review triggered various actions, including a host of "new compliance projects." *Id.* That is a defense-friendly inference. Documents regarding those projects were either not produced as part of Walmart's Section 220 production or were so heavily redacted that no inference can be drawn about the substance of the redacted text.

In November 2010, the President of the Walmart Stores segment sent a memorandum to the Audit Committee to provide an update on "Health & Wellness

15

Transforming Compliance and Quality Assurance." *See* Ex. 39. Senior officers, including Robson Walton, were copied. *Id.* at '330.

In his memo, the President gave a mixed report on Walmart's compliance efforts. To the good, he stressed some positive steps:

> Since our last report we have restructured our field operations management structure to improve oversight. We have built a dedicated Professional Affairs group headed by a vice president to oversee quality and compliance assurance. This group includes a new staff of auditors and quality assurance specialists. It also includes a credentialing team to assure compliance with licensure laws. We have also established a group to train professionals in the field including pharmacy technicians. A process for tracking key performance indicators of thousands of pharmacy technicians will be in place in all stores within the next 6 months.

*Id.* But after that leadup, the President gave a more conservative assessment of existing efforts and the work yet to come: "Frankly, we are not satisfied with our progress addressing many challenges that we know to exist." *Id.*

The memo identified two significant challenges. The first challenge, identified in a single sentence, was redacted. The redaction was marked "NR/ACP/AWP," for non-responsive, attorney-client privilege, attorney work product. Because the single sentence redaction appears in an otherwise responsive paragraph, the redaction is dubious, and with three possibilities provided, the basis for it is unclear. At the pleading stage, the plaintiffs are entitled to an inference that the redacted text referenced a compliance failure that Walmart was not addressing. The second challenge was implementing ConnexUs, a dispensing software program that would assist pharmacists in managing their work and

16

complying with legal requirements. Referring to both challenges, the President noted that "these are areas where we've still got work to do." *Id.*

The memo attached an eight-page presentation on compliance. Virtually all of the presentation was redacted as non-responsive. That claim is dubious for a presentation that dealt with the status of compliance in the Health and Wellness Division.

**D.     The DEA Settlement**

In February 2011, Walmart and the DEA entered into the DEA Settlement. *See* Ex. A. The DEA Settlement required Walmart to implement and maintain a compliance program for all of its pharmacies. The principal provision states:

> Walmart agrees to maintain a compliance program, updated as necessary, designed to detect and prevent diversion of controlled substances as required by the Controlled Substances Act ("CSA") and applicable DEA regulations. This program shall include procedures to identify the common signs associated with the diversion of controlled substances including but not limited to, doctor-shopping, requests for early refills, altered or forged prescriptions, prescriptions written by doctors not licensed to practice medicine in the jurisdiction where the patient is located, and prescriptions written for other than a legitimate medical purpose by an individual practitioner acting outside the usual course of his professional practice. The program shall also include procedures to report thefts and significant losses of controlled substances . . . and the routine and periodic training of all Walmart employees, including new employees, responsible for controlled substances regarding their responsibilities under the CSA and regarding relevant elements of the compliance program.

*Id.* § III.4.a.

Through this paragraph, Walmart committed to the DEA to establish and maintain a compliance system that would result in its pharmacies being able to satisfy the Inventory

17

Control Requirement, the Recordkeeping Requirement, and the Refusal-To-Fill Obligation.

Other sections of the DEA Settlement identified additional features that Walmart's compliance program needed to include, as well as problems that it had to address. For example:

- Walmart committed to notifying the local DEA office within seven business days of any refusal-to-fill decision by one of its pharmacists. *Id.* § III.4.b.

- Walmart committed to having a system that would record and maintain identifying information from a person picking up a controlled substance prescription in a form that would be readily retrievable. *Id.* § III.4.c.

- Walmart committed to instituting policies and procedures to block early refills of controlled substances. § III.4.i.

Walmart expressly agreed that the obligations in the DEA Settlement "do not fulfill the totality of its obligations under the CSA and its implementing regulations." *Id.* § III.4.a.

The term of the DEA Settlement ran from March 11, 2011 to March 11, 2015. *Id.* at § III.13. Because the DEA Settlement spoke of *maintaining* a compliance program and *updating* it as necessary, it is plain that the DEA was not setting March 11, 2015 as a deadline date by which Walmart had to achieve compliance. Instead, the DEA Settlement required that Walmart work in good faith to achieve compliance earlier, then remain in compliance for the remainder of the term of the DEA Settlement, while updating its systems as necessary.

**E.     Walmart's Efforts To Comply With The DEA Settlement**

By August 2011, Walmart had created a summary overview of its formal compliance program for the Health and Wellness Division. *See* Ex. 15. The summary described a reporting structure, concepts, and principles that tracked what a Fortune 500 company's compliance program should have. The summary included an "Index of Health and Wellness Procedures" that included more than 150 procedures for pharmacies to follow. *Id.* at 16–19. Walmart produced a number of the policies that were in effect at that time, which told pharmacy employees how to handle a variety of tasks.[32]

On paper, the effort to establish a compliance system that would satisfy the DEA Settlement seemed off to a good start. The problem lay in the funding and staffing for the work necessary to create the controlled substance monitoring program that would provide the infrastructure for the words on the paper. The team responsible for doing the work estimated that it needed $40 million to accomplish the tasks. Management only provided a budget of $11 million. Ex. 82 at '364. In an internal email, a team member described that amount as "just enough to cover [existing] compliance projects" with "all development [projects] to be evaluated on a project by project basis." *Id.* at '363. Another team member stated that they faced a "Sophie's Choice" that required selecting "one high need project

---

[32] *See* Exs. 17, 19, 21, 22, 23, 25–29, 31–32, 37, 39. Walmart also produced some policies that were adopted later. Ex. 18 (June 2015); Ex. 20 (Aug. 2012); Ex. 24 (Oct. 2014); Ex. 30 (Aug. 2014); Ex. 33 (Apr. 2017). These documents and other exhibits support an inference that Walmart's compliance program became more detailed over time.

over another." *Id.* at '363. Walmart did not produce a final budget for the Health and Wellness Division as part of its Section 220 document production, entitling the plaintiffs to an inference that a budget sufficient to fund the projects necessary to comply with the DEA Settlement did not exist.

Two entries on Walmart's privilege log indicate that management reported to the Audit Committee on the Health and Wellness compliance program in November 2011. Ex. 14 at Item Nos. 34 & 41. The privilege log describes the discussions as addressing "Walmart's Health & Wellness Compliance Program, including compliance with DEA regulations and agreements, controlled-substance training, and an inventory variance reporting tool." Ex. 14 Item No. 34 at 4. There are no non-privileged documents in the Section 220 production reflecting any non-privileged discussion or decisions about the business issues associated with achieving compliance with the DEA Settlement, such as the amount of money that the team responsible for implementing the projects needed to accomplish its work. Read together, the internal email about a lack of funding, the privilege log entries regarding an Audit Committee meeting, and the absence of any indication of responsive action support a pleading-stage inference, favorable to the plaintiffs, that management told the Audit Committee about the budgeting issue and that the Audit Committee took no action in response.

## F.     The 2012 Memo

In January 2012, nine months into the term of the DEA Settlement, Walmart's Chief Administrative Officer updated the Audit Committee and the Executive Committee about

compliance efforts in the Health and Wellness Division. Ex. 6 (the "2012 Memo"). The cover memorandum acknowledged that compliance efforts had fallen behind schedule and stated bluntly that "[s]ignificant compliance issues remain unresolved." *Id.* at '035. Walmart's central compliance group ("Corporate Compliance") had taken the effort away from the Health and Wellness Division, and the memo gives the impression of a full reboot. To that end, the memo advises that a "Five-year Health & Wellness compliance strategy is being developed." *Id.* The strategy did not already exist, nor had it been implemented. It was being created.

A supporting slide deck elaborated on those high-level points. Reinforcing the impression of a full reboot, one slide stated under "The Path Forward" that a "New compliance plan [is] being developed." *Id.* at '037. The next slide identified four phases of planned activity that the program "will involve": (1) "Develop Commitments," (2) "Assess Gaps," (3) "Mitigate Risks," and (4) "Maintain and Monitor." *Id.* at '038. It is reasonable to infer at the pleading stage that none of those stages had happened yet. Along similar lines, the slide stated that the "Proposed Health & Wellness Compliance Plan" would start with creating a "Road map of Health & Wellness regulatory obligations" and a "Road map of business activities that require controls." *Id.* at '039.

The slide deck observed that the project needed "[s]easoned leadership that strikes the proper balance between business and compliance considerations." *Id.* at '040. At the pleading stage, the plaintiffs are entitled to an inference that the memo's reference to a

21

"proper balance between business and compliance considerations," meant limiting compliance efforts when they threatened profitability.

An appendix to the slide deck identified a list of items that Walmart had completed during fiscal years 2011 and 2012. *See id.* at '044–'045. Walmart starts its fiscal year on February 1 of the prior year, so fiscal year 2011 ran from February 1, 2010 to January 31, 2011, and fiscal year 2012 ran from February 1, 2011 to January 31, 2012. Significant portions of the appendix are redacted. The reasonable inference is that the Health and Wellness Division had accomplished some things, but their effort had fallen far short, so Corporate Compliance took over and restarted the project. The list of completed activities conspicuously omits significant items identified in the DEA Settlement, such as testing for doctor shopping, flagging requests for early refills, or checking for altered or forged prescriptions.

Read together, the 2012 Memo and accompanying materials support a pleading-stage inference that the Health and Wellness Division had created a summary of what a nice compliance program would look like, then never did the work to implement one. It was now 2012, and Corporate Compliance was proposing to develop a five-year plan to implement a new compliance program. That implementation would not be accomplished until 2017, two years after the DEA Settlement expired in March 2015. To state the obvious, Walmart would not comply with the DEA Settlement.

The 2012 Memo and accompanying materials were presented to the Audit Committee and the Executive Committee, so those committees knew. Minutes from an

22

Audit Committee meeting in February 2012 reflect that the Audit Committee received a report—from the Chief Administrative Officer who authored the 2012 Memo—on the state of Walmart's Health and Wellness compliance efforts, the transition to Corporate Compliance, and the proposed five-year plan that Walmart was developing. Ex. 7. Minutes from an Audit Committee meeting in March 2012 reflect that the Audit Committee received another report on the state of Walmart's "Health and Wellness Compliance landscape." Ex. 8 at 6.

The Board met six times during fiscal year 2013. The pleading-stage record does not include any meeting minutes for any Board meeting. The plaintiff-friendly inference is that the Board was not monitoring compliance with the DEA Settlement or the Controlled Substances Act and was relying on the Audit Committee to fulfill its monitoring duties.

## G. Maximizing Sales Through Opioid Prescriptions

During the same period that Walmart failed to invest in and build out a system of compliance, Walmart used the filling of opioid prescriptions to enhance its bottom line.

One initiative was to incentivize pharmacists to fill more prescriptions. Walmart implemented Pharmacy Facility Incentive Plans that paid bonuses to pharmacists based on the number of prescriptions filled, the amount of profit generated, and customer relations metrics. Walmart advocated within the National Association of Chain Drug Stores DEA Compliance Working Group for permission to include controlled substances within the pharmacist incentive programs, insisting that "[i]ncentive programs should be entirely agnostic as to the type of prescriptions (controlled substances or non-controlled drugs)

23

filled." Compl. ¶ 120. Walmart opposed a proposal to treat "[e]xcessive volume and rate of growth of dispensing controlled substances" as a red flag. *Id.* ¶ 120 n.50. Consistent with those positions, Walmart's Pharmacy Facility Incentive Plan for 2012 did not distinguish between prescriptions for controlled substances and other prescriptions. As pharmacists filled more prescriptions, their incentive payments increased.

Walmart also introduced a Management Incentive Plan that provided for bonuses to eligible employees once the number of prescriptions filled in a year exceeded 190,000. The plan did not contain any metrics for patient safety or red flag detection. *Id.* ¶ 120.

Through these incentive plans, Walmart provided pharmacists with financial inducements to fill more prescriptions and to disregard their Refusal-To-Fill Obligation. Walmart also imposed direct pressure on pharmacists by setting a goal of filling a prescription in less than twenty minutes, and that target was later reduced to fifteen minutes. That short period did not enable a pharmacist to perform the due diligence and fill out the forms necessary to investigate a prescription and, if warranted, refuse to fill it. *Id.* ¶ 119.

Walmart also took steps to bring more users of prescription opioids to its pharmacies. Walmart collaborated with McKesson on trial offers, savings cards, and e-coupons for opioids such as OxyContin, Butrans, Hysingla, Ultram, Magnacet, and Nucynta. For the Magnacet loyalty program, Walmart and CVS handled 49% of all claims. For Nucynta, Walmart was in the top four pharmacies by the number of claims. Walmart

24

also partnered with Purdue Pharma on direct mail campaigns to sell Butrans, using Walmart's prescription data to target patients who had used opioids. *Id.* ¶¶ 115–116.

Walmart's opioid marketing campaigns not only generated sales for its pharmacies, but also helped cross-sell other products. By bringing customers into its stores to fill opioid prescriptions, Walmart had the opportunity to sell them other products. *Id.* ¶ 119.

The complaint's allegations support a pleading-stage inference that Walmart sought to increase the number of opioid prescriptions that it filled as a means of increasing profits. Walmart did not exhibit comparable initiative on the compliance front. The plaintiff-friendly inference is that Walmart had a business plan of prioritizing profits over compliance.

## H.    The Whistleblower

In August 2012, a whistleblower notified the Chairman of the Board and Walmart's Global Ethics Office about concerns regarding controlled substance prescriptions. The whistleblower was a full-time floater pharmacist who filed a *qui tam* complaint in 2013 that outlined his concerns. He asserted that the following events took place during the six weeks between July 14 and August 30, 2012:

- He observed Walmart pharmacists filling prescriptions that bore red flags, failing to comply with the Recordkeeping Requirement, and failing to comply with the Refusal-To-Fill Obligation.

- He received significant pushback from the Health and Wellness Division about his complaints and was terminated.

25

The complaint was not unsealed until 2018.[33]

The plaintiff-friendly inference is that the whistleblower put the Chairman of the Board and Walmart's Global Ethics Office on notice about the consequences that were flowing from a business strategy that prioritized filling opioid prescriptions over building the compliance infrastructure and investing in the resources necessary to comply with the DEA Settlement and the Controlled Substances Act. That red flag reached the highest levels of Walmart management, including the member of the Board entrusted with primary responsibility for Walmart's governance.

## I.      Reports To Senior Officers, The Audit Committee, And The Board

The next event for which Walmart provided responsive documents in the Section 220 production took place on November 8, 2012, when the "Global Compliance and Ethics Committee" met. That was a committee of compliance executives and employees, so this decision calls it the Employee Compliance Committee.

Walmart produced a copy of the meeting minutes, which comprise seven pages. All of the substantive portions of the minutes were redacted for non-responsiveness and

---

[33] The defendants argue that the plaintiffs waived any arguments based on the whistleblower by not spelling them out in their answering brief. The complaint was 135 pages long and contained 316 numbered paragraphs. The plaintiffs could not reproduce every factual assertion in their brief, nor did they have to. Like the defendants, the plaintiffs made legal arguments in their brief based on their complaint. The complaint, the documents it incorporates by reference, and documents subject to judicial notice establish the factual record for a motion to dismiss. The briefs spell out the legal arguments for and against dismissal. The plaintiffs did not waive their factual allegations about the whistleblower.

26

attorney-client privilege with the exception of the following sentence: "Ms. Harris then provided an update to the Committee on the overall status of Health and Wellness Compliance projects." Ex. 11 at 2. "Ms. Harris" presumably refers to defendant Phyllis Harris, who was then the Senior Vice President and Chief Compliance Officer for the Walmart Stores segment. *See* Compl. ¶ 56. Without any substantive text to draw on, one possible inference is that the report was good (as in, "we are making great progress"). Another possible inference is that the report was bad (as in, "we are falling further behind in our compliance efforts, know we are not complying with the DEA Settlement, and know we will not be able to achieve compliance"). There are no non-privileged documents reflecting the Employee Compliance Committee making any business decisions or taking any action. At the pleading stage, the absence of evidence about action by the Employee Compliance Committee supports a plaintiff-friendly inference that the Employee Compliance Committee failed to take action to promote compliance with the DEA Settlement.

In March 2013, Harris and Jay Jorgensen, Senior Vice President and Global Chief Compliance Officer for Walmart, reported to the Audit Committee on the status of various compliance projects. It is reasonable to infer that Jorgensen and Harris reported on the state of compliance with the DEA Settlement.

The written report gave each project a color to indicate its status: green for "on schedule," yellow for "watch list," and red for "major issues." *See* Ex. 46 at '601. The report stated that the "diversion analytics tool to monitor suspicious controlled substance

27

activity remains in a status of red." *Id.* Walmart needed that tool to "monitor and detect drug diversion indicators and suspicious activity related to controlled substances." *Id.* at '604. Monitoring and detecting drug diversion and suspicious activity was a central requirement of the DEA Settlement. The Audit Committee was on notice that Walmart was not creating one.

Development of the order monitoring tool had stopped because of a problem with Walmart's Data Centralization project, which also had a status of red. Walmart had purchased a limited amount of database capacity, and until a decision was made to buy more capacity, nothing else could be done. Without a decision to buy more capacity, Walmart would have a read-only database that could not support "several critical business and compliance initiatives." *Id.* at '601.

It is reasonable to infer that the Audit Committee knew from Harris's written and oral reports that Walmart was not complying with the DEA Settlement and had not allocated the resources necessary to achieve compliance. There is no indication in the pleading-stage record of the Audit Committee engaging in any discussion of the business need to acquire more database capacity, nor is there any indication that the Audit Committee made a decision to acquire more capacity. There is no indication of any business-oriented discussion about the state of the drug diversion analytics system. At the pleading stage, the plaintiffs are entitled to an inference that the Audit Committee knew that a critical requirement for the DEA Settlement was in a status of red and took no action in response.

Walmart's privilege log contains entries indicating that the Employee Compliance Committee met on July 18, 2013 and on October 10, 2013. The descriptions on the log refer to discussions about the "Health and Wellness compliance program, including controlled-substance related compliance initiatives pertaining to dispensing and documentation controls, and diversion analytics." Ex. 14 at Item Nos. 143, 144, 158, 159. Once again, there are no non-privileged documents reflecting the Employee Compliance Committee making any business decisions or taking any action. At the pleading stage, the absence of evidence supports a plaintiff-friendly inference that the Employee Compliance Committee knew about and did not take any action to address problems with Walmart's compliance system, such as the code-red status of the diversion analytics tool to monitor suspicious controlled substance activity.

During a two-day meeting of the Board in September 2013, the Audit Committee, two members of the Executive Committee, and Walmart's CEO had a "legal, compliance, and ethics session." Ex. 47 at 18. Jorgensen presented a report on health and wellness compliance. The Board meeting minutes span eighteen pages. Walmart redacted everything except for the following: "Mr. Williams reported that the [Audit] Committee had conducted a legal, compliance and ethics session. He stated that during this session, the Committee had received [REDACTED] . . . reports regarding Walmart's health and wellness compliance initiatives. . . ." *Id.* Mr. Williams is inferably Christopher J. Williams, then a director and Chair of the Audit Committee.

One inference from the redacted portion is that Mr. Williams told his fellow directors that everything was on track. Another inference is that Mr. Williams told his fellow directors that key aspects of Walmart's program were not on track, that those components were in a status of red, and that Walmart was not complying with the DEA Settlement. At this stage of the proceedings, the plaintiffs are entitled to the latter inference.

In October 2013, the Health and Wellness Division prepared an assessment of Walmart's controlled substances risk. Dkt. 40 at 15. The assessment showed the status of various compliance projects and reported that the project to "[d]esign & operate a systems [sic] to detect suspicious orders and report to the DEA when discovered" remained in red. Ex. C. at '751. The summary reported that the project to "[e]stablish additional maximum order limits of highly abused drugs" was in yellow. *Id.* Neither project had a delivery date. For both, the delivery date was marked "TBD." *Id.*

Developing and maintaining a system to detect suspicious orders and report them to the DEA was one of Walmart's core obligations under the DEA Settlement. The four-year term of the DEA Settlement was scheduled to end on March 11, 2015. As of October 2013, Walmart had used up two years and seven months of the four-year term. Walmart had only seventeen months left to implement the mandates in the DEA Settlement, including a full-scale suspicious order monitoring system.

Although Walmart had failed to implement a suspicious order monitoring system, Walmart had succeeded in attracting more customers with opioid prescriptions. In a June 2012 Health and Wellness Division survey, pharmacists reported that they "lacked

30

sufficient staff to handle the workload and did not have enough time to conduct their duties in a manner that protected patient safety." Compl. ¶ 125. Only 59% of pharmacy employees reported that their locations had sufficient staff. In February 2013, a pharmacy manager in Oklahoma reported that a particular clinic had been writing prescriptions for a large number of narcotic pain relievers. She emphasized that "[o]ther chain and independent pharmacies in the area have stopped accepting prescriptions from this clinic, which is causing them to funnel in to [sic] our Wal-Mart stores."[34] She added:

> Not a single one of us ever feel comfortable about filling these prescriptions, and if questioned, we wouldn't be able to justify this type of prescribing. . . . I think that if we continue this we are going to be in serious trouble and quickly trigger an investigation. We do not want to continue filling from this clinic. Other pharmacies are stopping and I feel that it is imperative that we follow suit. It will look bad if we are the ones allowing these drugs to be abused or even on the street.

Compl. ¶ 187. These allegations support a reasonable inference that Walmart was not providing its pharmacists with the time and other resources they needed to fulfill their Refusal-To-Fill Obligation.

---

[34] Compl. ¶ 187 (citing Pls.' Trial Ex. P-26892_00001, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804-DAP (N.D. Ohio Oct. 28, 2021), ECF No. 4094-34). *See e.g.*, *Nelson v. Emerson*, 2008 WL 1961150, at *2 n.2 (Del. Ch. May 6, 2008) (taking judicial notice of "documents filed in the related federal court proceedings" in addressing a motion to dismiss). *See generally In re Career Educ. Corp. Deriv. Litig.*, 2007 WL 2875203, at *9 (Del. Ch. Sept. 28, 2007) ("When considering a motion to dismiss, the court also may take judicial notice of publicly filed documents, such as documents publicly filed in litigation pending in other jurisdictions."(footnote omitted)).

**J.      Walmart Prioritizes Internal Inventory Diversion.**

Until January 2014, Walmart's pharmacists were using a jerry-rigged combination of two different computer systems to review orders. A pharmacist primarily used ConnexUs, a workflow management system that tracked prescriptions as they moved through the order-fulfillment process. A pharmacist could use ConnexUs to determine whether a licensed prescriber wrote the prescription, but ConnexUs did not have any capability to identify other red flags. To check for red flags, the pharmacist needed to log into a second, state-run prescription monitoring program that tracked early refills and other indicia of illegitimate prescriptions. In states that did not offer a state-run prescription monitoring program, Walmart's pharmacists had nothing to access.

It is reasonable to infer that this patchwork system did not satisfy Walmart's obligations as a dispenser under the Controlled Substances Act and the DEA Settlement. Walmart's pharmacists did not have the time or resources to fulfill their Refusal-To-Fill Obligation, and they did not have access to a Walmart computer system that could help them identify and conduct due diligence on red flags.

In March 2014, Walmart publicly disclosed improvements to its Health and Wellness compliance program that included "[c]reating a diversion analytics tool to deter, detect, and remedy attempts at pharmaceutical diversion in U.S. Walmart and Sam's Club" stores. Compl. ¶ 352; Dkt. 40 at 51; *accord* Wal-Mart Stores, Inc., Definitive Additional Materials (Schedule 14A), at 9 (Apr. 23, 2014). Walmart's new system only monitored for theft and loss of controlled substances *within* Walmart. Put differently, the new system

addressed the Inventory-Control Requirement, but did not address other aspects of Walmart's obligations as a pharmacy operator, such as supporting its pharmacists in their efforts to comply with their Refusal-To-Fill Obligation. It is reasonable to infer that Walmart took steps to meet the compliance obligation that helped its bottom line, while not taking steps to meet compliance obligations that did not confer that benefit. *See* Compl. ¶ 191.

Also in March 2014, the head of compliance for the Health and Wellness Division reported to the Audit Committee on the division's compliance priorities for fiscal year 2015. *See* Ex. B. Supporting slides included a photograph dated July 12, 2012, from a Walmart pharmacy in Tampa, Florida that depicted scores of patrons waiting in line at 7:00 a.m., two hours before the pharmacy opened, with a "very high number of prescriptions for Oxycodone." Compl. ¶ 185. The presentation reported that after the July 2012 incident, the compliance team "began to assess our processes" to avoid the "risk of our pharmacies becoming the pharmacy of choice for 'pill mills.'" *See* Ex. B.

The Audit Committee meets quarterly, so it is reasonable to infer that Walmart had done nothing until three months before the Audit Committee meeting in March 2014, to address the risk that its pharmacists were filling prescriptions for pill mills. The photograph pre-dated the Audit Committee meeting by over eighteen months, yet the head of compliance reported that his team had just started to assess Walmart's processes. Instead, Walmart had been following a business strategy that sought to increase opioid prescription

33

traffic at its pharmacies, while reducing the ability of its pharmacists to meet their Refusal-To-Fill Obligation.

It is reasonable to infer that the Audit Committee knew that Walmart was facing problems complying with its obligations as a dispenser of prescription opioids. To the good, the compliance officer told the Audit Committee that *after* seeing the photograph, the compliance team had implemented additional operational controls in Florida, where the controls appeared to have some effect. *See id.* at 11. It is not clear whether the controls were implemented throughout the company. For that snapshot in time, the members of the Audit Committee could believe that management was taking action. At the very least, they had been shown another red flag regarding the state of Walmart's compliance systems and the consequences of a business strategy that sought to increase the number of opioid prescriptions that its pharmacists filled.

## K. Additional Reports On Walmart's Failures To Comply With The DEA Settlement And The Controlled Substances Act

In May 2014, the Audit Committee received a fourteen-page report that summarized the status of compliance efforts in the Health and Wellness Division. Ex. 49. The report was authored by Jorgensen, Harris, and James Langman, Vice President of Health and Wellness Compliance for the U.S. The report discussed Walmart's new diversion analytics tool and explained that it had been operational since November 2013. That was the tool that addressed internal inventory diversion. With the tool in place, the compliance team uncovered major instances of internal opioid diversion, including a shortfall of 16,000

34

dosage units from a pharmacy in Indiana and a shortfall of 4,689 dosage units from two pharmacies in Maryland. *Id.* at '822–23.

The report provided a high-level discussion of Walmart's obligations under the Controlled Substances Act and observed that Walmart had experienced a 114% increase in incidents relative to the prior year. *Id.* at '824. The report attributed those figures to the new analytics tool identifying internal theft, plus enhanced communication about how to report a controlled substance theft or loss. Another indicator of increasing problems was the number of violations that regulators identified. During fiscal year 2014, state and federal regulatory agencies made 2,096 visits to Walmart pharmacies, with 547 visits (26%) resulting in violations of recordkeeping requirements, associate licensing requirements, equipment deficiencies, prescription discrepancies, incomplete logs, or instances of internal diversion. *Id.* at '825.

The report generally conveys a feel-good message that everything is fine. The report did not mention the DEA Settlement, Walmart's obligations under it, or the status of Walmart's efforts to comply with those obligations. Only ten months remained before the term of the DEA Settlement ended.

In June 2014, the Health and Wellness Division evaluated the progress of the suspicious order monitoring project. *See* Ex. D. The assessment recognized that the project was part of the DEA Settlement and that a suspicious order monitoring system still was not in place. The assessment included the following question: "Is the Risk being mitigated today by manual, systemic, or a combination of both today [sic] (regardless of optimal or

35

not)?" *Id.* at '701. The assessment gave a pointed answer: "No." *Id.* The suspicious order monitoring project had "no process in place." *Id.* The report stated that the project was "Board Informed," supporting an inference that the Board had been informed of the situation. *Id.*

In October 2014, a survey of Walmart's pharmacists generated grim results. Only 43% of pharmacy employees reported having sufficient staffing to handle the workload. In the October 2014 survey, "a substantial proportion of pharmacy employees reporting that they felt rushed with processing prescriptions." Ex. E ¶ 121. It is reasonable to infer that Walmart was not supporting its pharmacists in complying with the Refusal-To-Fill Obligation. Walmart was continuing to prioritize profits by seeking to fill prescriptions.

One month later, in November 2014, the Board reviewed Walmart's compliance with the DEA Settlement and the Controlled Substances Act. Walmart withheld the meeting minutes in their entirety, noting on its privilege log that the discussion involved the "Health & Wellness compliance program, including compliance with the Controlled Substances Act." Compl. ¶ 222; *see* Ex. 14 at Item No. 49. There are no documents from the Section 220 production indicating that the Board had any business discussions or made any business decisions about compliance with the DEA Settlement. Given what other documents show about the state of Walmart's noncompliance with the DEA Settlement, it is reasonable to infer that the Board knew about Walmart's noncompliance and took no action other than to receive legal advice.

36

In February 2015, just one month before the DEA Settlement expired, a pharmacist in Texas wrote to one of Walmart's compliance directors for controlled substances. The pharmacist expressed concern about filling prescriptions for a pill-mill doctor. Compl. ¶¶ 27, 124, 260. The compliance director responded by candidly explaining how Walmart had approached the DEA Settlement:

> The [DEA Settlement] that requires the reporting of Refusal to fill expires in 30 days. We have not invested a great amount of effort in doing analysis on the data since the agreement is virtually over. Driving sales and patient awareness is a far better use of our Market Directors and Market manager's time.

*Id.* ¶ 27. That statement openly prioritized profits ("Driving sales") over compliance.

Similarly, during the Opioid MDL, a former employee testifying as Walmart's 30(b)(6) representative stated that Walmart chose not to adopt a more rigorous system in connection with the DEA Settlement and the Controlled Substances Act because it "didn't make sense for the business." *Id.* ¶ 240. That testimony likewise indicates that Walmart prioritized profits over compliance.

On March 11, 2015, the DEA Settlement expired. There are no documents from December 2014 or from January, February, or March 2015 indicating that the Board discussed any business issues or made any business decisions regarding the DEA Settlement. That noteworthy absence stands out against the background of the October 2014 pharmacy survey, the exchange between the pharmacist and the compliance director, and the testimony of the employee. Considered together, it is reasonable to infer that the Board knew that Walmart was not complying with the DEA Settlement, that the Board was

37

not enabling pharmacists to comply with their Refusal-To-Fill Obligation, and that the Board did nothing in response.

## L. Walmart Continues To Undermine The Refusal-To-Fill Obligation.

After the DEA Settlement term expired, Walmart's pharmacists continued to lack an internal system that they could use to access information about prescriptions as part of fulfilling their Refusal-To-Fill Obligation. *See* Compl. ¶ 251. Walmart did introduce a software program called Archer that captured information about prescriptions that pharmacists refused to fill. But Walmart prohibited other pharmacists from accessing that information, thus limiting the pharmacists' ability to investigate red flags and to make informed decisions about whether to refuse to fill a prescription. As of March 4, 2016, even regional directors could not access the information. *Id.* ¶ 253. As of July 9, 2018, pharmacists still could not access the information. *Id.* ¶ 255.

In November 2016, the successor committee to the Employee Compliance Committee held a meeting. Ex. 13. For simplicity, this decision continues to refer to the committee using the same name. The minutes of the meeting are redacted virtually in their entirety. Only one substantive sentence survived: "Mr. Jorgensen noted that the materials for the Committee's October 13, 2016 meeting included U.S. Health and Wellness Compliance training materials." *Id.* at '683. That elliptical statement supports competing inferences. One is that Jorgensen provided a positive update about the state of the training program. Another is that Jorgensen reported on inadequacies in the training program. At this stage of the proceedings, the plaintiffs receive the benefit of the latter inference.

38

Walmart's privilege log contains entries suggesting that the Employee Compliance Committee met on twenty other occasions from 2016 through 2020. Walmart withheld all of the relevant meeting minutes, noting on its privilege log only that the discussions involved "controlled substances,"[35] "opioids,"[36] or Walmart's "Health & Wellness compliance program."[37] There are no indications that the committee had any business discussions, made any business decisions, or took any type of action. If Walmart's assertions of privilege are to be believed, then as the opioid epidemic raged, Walmart's senior compliance employees did nothing except receive and consider legal advice. They knew about the problem and took no action whatsoever. Although that seems highly unlikely, that is the record that Walmart created through its highly redacted Section 220 production.

The fact that so many meetings took place supports an inference that the officers and employees on the Employee Compliance Committee closely monitored Walmart's compliance with its obligations under the Controlled Substances Act. At the same time, the allegations in the complaint, together with other documents in the record, support an inference that Walmart was failing to comply with its obligations as a dispenser of prescription opioids and, in particular, was undermining its pharmacists' ability to fulfill

---

[35] *See* Ex. 14 at Item Nos. 123–124, 126–130, 133–138, 140, 142.

[36] *See id.* at Item Nos. 131–132.

[37] *See id.* at Item Nos. 123–124, 126–127, 139–141.

the Refusal-To-Fill Obligation. The court therefore must infer that the Employee Compliance Committee knew about Walmart's failure to fulfill its obligations as a dispenser of prescription opioids. The absence of any indication that the Employee Compliance Committee did anything except gather to receive and discuss legal advice, supports a pleading-stage inference that the members of the committee consciously ignored Walmart's compliance failures.

## M.     Walmart's Obligations As A Distributor Of Prescription Opioids

The discussion to this point has focused on Walmart's role as a dispenser of prescription opioids through its retail pharmacies. Until April 2018, Walmart engaged in the wholesale pharmaceutical distribution business, and it supplied its retail pharmacies with prescription opioids under a DEA license that required compliance with the Controlled Substances Act.[38]

While operating as a wholesale distributor of prescription opioids, Walmart had an obligation to maintain "effective control against diversion of [opioids] into other than legitimate medical, scientific, and industrial channels."[39] Walmart also had more specific obligations. A distributor must "design and operate a system" to identify "suspicious orders of controlled substances" and report them to the DEA (the "Reporting Requirement").[40]

---

[38] 21 C.F.R. § 1301.11(a).

[39] 21 U.S.C. § 823(b)(1).

[40] 21 C.F.R. § 1301.74(b).

"Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."[41] Once a distributor has reported a suspicious order, the distributor must either decline to ship the order or conduct due diligence to determine whether the order is likely to be diverted into illegal channels. The distributor can only ship the order if it determines after conducting due diligence that the order is *not* likely to be diverted into illegal channels (the "Shipping Requirement").[42]

From the early 2000s until April 2018, Walmart distributed opioids to its pharmacies from its distribution center in Bentonville, Arkansas, which was the only distribution center that handled those products. Between 2006 and 2012, the Bentonville distribution center shipped an increasing number of opioid pills each year, with the total shipped exceeding five billion pills across the six-year period. Before November 2010, Walmart had no written policies or procedures in place to govern monitoring for suspicious orders in its distribution business. Instead, Walmart charged its hourly wage employees—who had no medical, pharmaceutical, or public health training—with the responsibility for identifying

---

[41] *Id.*

[42] *See Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206, 212 (D.C. Cir. 2017) (discussing distributor obligation under *Southwood Pharm., Inc.*, 72 Fed. Reg. 36,487, 36,501 (Drug Enf't Admin. July 3, 2007)).

anything that looked suspicious. Walmart did not provide any standards, training, or processes to assist these unqualified employees in making that determination.[43]

In November 2010, Walmart implemented its first written policy for its distribution business. Titled "Identifying and Reporting Purchases of Controlled Substances," it contemplated employees at the Bentonville distribution center reviewing a monthly report by hand and identifying any orders for controlled substances that constituted more than 3.99% of a single pharmacy's total drug purchases during the prior month. Compl. ¶ 139. The November 2010 policy did not identify other criteria that could render an order suspicious. The employees were instructed to "forward the reports to the appropriate [Walmart] Drug Diversion Coordinator for further review." *Id.* ¶ 140. There were no further written policies about what the Drug Diversion Coordinator was supposed to do. The Executive Committee and the Audit Committees were briefed on this policy during a meeting that same month. *Id.* ¶ 141.

Walmart later determined that it needed a computerized system. Rather than obtaining a specialized compliance system, Walmart repurposed an existing inventory tool called Reddwerks that had not been designed for compliance. To flag suspicious orders, Walmart implemented "hard limits" on orders of more than 2,000 dosage units of

---

[43] Compl. ¶¶ 133-134; *see In re Nat'l Prescription Opiate Litig.* (*Opioid MDL SJ Decision*)*,* 2020 WL 425965, at *1 (N.D. Ohio Jan. 27, 2020).

oxycodone and 5,000 dosage units of other opioid medications. *Id.* ¶ 174. The Reddwerks system had no ability to flag suspicious orders based on other criteria. *Id.* ¶ 176.

Walmart was supposed to flag orders that exceeded those hard limits and report them to the DEA, but Walmart chose a more profit-friendly approach. Walmart adopted a practice of cutting back flagged orders to the hard-limit thresholds and filling them as if they were non-suspicious orders. Walmart then passed along the balance of the orders to another distributor to fill. Walmart thus ensured that the full order was filled, even though the order exceeded the hard limits. *Id.* ¶¶ 101, 173–175, 177.

The cutback system resulted in Walmart reporting almost no suspicious orders to the DEA. At this stage of the proceedings, the plaintiffs are entitled to an inference that Walmart knowingly circumvented its own suspicious order monitoring system.

In January 2014, Walmart hired an external consulting outfit, MuSigma, to evaluate the repurposed Reddwerks system and its hard limits. MuSigma identified serious flaws and recommended modifications to enable the tool to do more than simply cap prescriptions at hard limits. The modifications would have cost $185,000. Walmart rejected the proposal. *See id.* ¶ 218–220. The modifications would have cost $185,000. Walmart rejected the proposal. One of the largest companies in the world rejected a proposal to

update a key component of its order monitoring system that would have cost only a bit more than a single pharmacist's annual pay.[44]

Walmart did not contemplate implementing a true suspicious order monitoring system until 2015. At a meeting on February 5, 2015, the Audit Committee reviewed Walmart's compliance objectives for fiscal year 2016. Compl. ¶ 224. Shortly before, the Global Chief Compliance Offer (Jorgensen) sent a memorandum to the Audit Committee, copying then-CEO Doug McMillon, that identified Walmart's compliance objectives. Walmart redacted the vast majority of the memo as non-responsive. Walmart produced text indicating that management set compliance objectives based on data-collection efforts, risk assessments in all retail markets, and progress made in prior years. Ex. 51 at '065. Walmart produced text for only the following objective: "In the U.S., implement controlled substance suspicious-order monitoring enhancements (which include both software and personnel changes) in the U.S. distribution facilities." *Id.* at '002.

---

[44] According to salary.com, a Walmart pharmacist makes between $76 and $84 per hour. *Hourly Wage for Walmart Inc. In Store Pharmacist Salary in the United States*, salary.com, https://perma.cc/2U57-H4TG (last visited Apr. 25, 2023). Assuming a forty-hour week and fifty workweeks per year, a Walmart pharmacist earns between $152,000 and $168,000. That is the same ballpark as the amount that Walmart declined to spend to update Reddwerks. I acknowledge that the salary.com figure is a 2023 figure and that I have not adjusted the Reddwerks expense for inflation.

The Audit Committee signed off on the plan, which called for implementation to begin in August 2015. The full Board met the following day, and the Audit Committee reported that it had approved Walmart's compliance objectives. *See* Compl. ¶¶ 228–233.

**N.    The Board Acknowledges An "Opioid Crisis" In The Midst Of A Barrage Of Lawsuits.**

During 2016 and 2017, Walmart faced a barrage of lawsuits based on its roles as a dispenser and distributor of prescription opioids. By the end of 2017, thousands of plaintiffs had filed cases against Walmart, and proceedings were underway to consolidate the suits in the Opioid MDL. During the same period, on December 7, 2016, Walmart learned that the U.S. Attorney for the Eastern District of Texas was conducting a criminal investigation into Walmart. Compl. ¶ 258.

At a November 2, 2017 Audit Committee meeting, Jorgensen provided an update on "a recent health and wellness compliance matter." Ex. 60 at 4. Without any context for guidance, it is reasonable to infer that Jorgensen was reporting to the Audit Committee on compliance issues related to Walmart's exposure from its role in the opioid crisis.

After Jorgensen introduced the topic, another senior compliance executive discussed "modifications to the Company's process for reporting suspicious controlled substance orders from its pharmacies." *Id.* Over two years earlier, in February 2015, the Audit Committee had approved management's first plan to modify Walmart's suspicious order monitoring system for its pharmacies. The November 2017 references support a plaintiff-friendly inference that Walmart's system had proven inadequate, created a serious

45

risk of legal noncompliance and corporate harm, and that corrective action was required. It had taken over two years for that issue to reach the Audit Committee.

The Board also met in November 2017, and the minutes of that meeting span sixty-eight pages. Ex. 61. Only three sentences of substantive text survived the redaction tool. The first reads: "Timothy P. Flynn, Chair of the Audit Committee, then provided the Audit Committee report." *Id.* at 15. The following partially redacted text appears on the next page: "He concluded his report by stating that the Audit Committee had received updates from management regarding various other matters including . . . [REDACTED] . . . enhanced processes and training for pharmacists regarding filling prescriptions of controlled substances." *Id.* at 16. The redactions were marked for non-responsiveness, attorney-client privilege, and attorney work product. The unredacted text provides no basis to infer that the Board or Audit Committee had any business-oriented discussion about compliance issues or made any business decisions about compliance issues.

A few pages later, the minutes read: "Dr. James I. Cash, Jr., Chair of the Nominating and Governance Committee (the 'NGC'), then presented the NGC report." *Id.* at 18. The next few pages are completely redacted for non-responsiveness before the following text appears:

> Next, Dr. Cash . . . [REDACTED – NOT RESPONSIVE] . . . noted that in 2018 an external advisor would be engaged to conduct the Board evaluation process, including questionnaires and interviews with all Directors and members of executive management of the Company beginning in February. Dr. Cash concluded his report by stating that a speaker had been engaged for a director education presentation in December regarding trends in healthcare regulations, including with regard to the opioid crisis.

*Id.* at 21–22.

The director education session about trends in healthcare regulations, including with regard to the opioid crisis, took place in December 2017. Ex. 62. After introductory remarks from Cash and Jorgensen, the Board, the "Executive Council," the "Walton Family," and Walmart's general counsel received an hour-long presentation on "the state of health care in the US; and the opioid crisis" from Michael Leavitt, the former Secretary of the U.S. Department of Health and Human Services. *Id.* at '693. After the presentation, the group engaged in a thirty-minute discussion. McMillon closed the meeting.

Walmart redacted the entire director education presentation on the basis of the attorney-client privilege and work product doctrine. Because of those redactions, the only possible inference is that during a meeting specifically called to address the opioid crisis, Walmart's directors and senior executives and unidentified members of the Walton family did not discuss any business issues, consider any business initiatives, or make any business decisions. All they did was receive and consider legal advice. Although that is hard to believe, Walmart's redactions necessarily lead to that inference.

In November 2017, after the Audit Committee and Board meetings but before the director education session, Walmart management decided to stop acting as a distributor of prescription opioids. Walmart wound down that business and, starting in April 2018, began to rely exclusively on third-party distributors. The complaint alleges that management did not tell the Audit Committee about its decision until September 2018, nearly one year after they made the decision and four months after Walmart exited the business. *See* Compl. ¶

47

271; Ex. 75. That allegation is difficult to credit, but nothing in the record supports a contrary inference. For example, there are no minutes in which Walmart management reports to the Audit Committee in November or December 2017 about the decision to exit from the opioid distribution business.

The events of November 2017 and December 2017 support competing interpretations. The defense-friendly view interprets the documents as showing the Audit Committee, Board, and management were monitoring opioid issues, including Walmart's suspicious order monitoring system. From that perspective, the directors could take comfort in the proposal from Walmart's compliance team to improve the system, and the information session with Secretary Leavitt provided already-educated board members, executives, and members of the Walton Family with additional insight into a situation that they already were handling well.

The plaintiff-friendly view interprets the record as showing that after approving management's plan for an updated suspicious order monitoring system in August 2017, the directors checked out. During 2016 and 2017, as more and more plaintiffs filed lawsuits against Walmart, the directors did nothing. In December 2016, when Walmart learned that the U.S. Attorney for the Eastern District of Texas was conducting a criminal investigation into the company, they did nothing. It was not until November 2017 that management raised an issue about Health and Wellness compliance and proposed enhancements to Walmart's systems.

48

At that point, knowing that Walmart had suffered a serious compliance failure, the directors, senior management, and the Walton Family scheduled an education session with Secretary Levitt to educate themselves on an issue they had not previously understood. Even then, however, the directors did nothing but listen to lawyers. They did not consider any business issues or make any business decisions. Only management took action by deciding to exit the distribution business. No one did anything about the pharmacy business.

## O. The Opioid MDL

In December 2017, the federal cases that thousands of plaintiffs had filed across the country were consolidated into the Opioid MDL. The bellwether complaint against Walmart in the Opioid MDL alleged that Walmart failed to:

- "adequately train their pharmacists and pharmacy technicians on how to properly and adequately handle prescriptions for opioid painkillers";

- "put in place effective policies and procedures to prevent their stores from facilitating diversion and selling into a black market";

- "conduct adequate internal or external reviews of their opioid sales to identify patterns regarding prescriptions that should not have been filled";

- "effectively respond to concerns raised by their own employees regarding inadequate policies and procedures regarding the filling of opioid prescriptions"; and

49

- "take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law with regard to controlled substances."

Compl. ¶ 289.

Walmart responded in January 2018 by sending an internal newswire on "Opioid Stewardship" to its pharmacists. Ex. 63. The newswire reminded pharmacists to comply with state-specific requirements for opioid training, to review an internal Walmart procedure about dispensing naloxone, and to watch a video. *Id.* at '913. There is no indication in the record that Walmart did anything to alter the system of compensation plans and other incentives that were driving the business model of filling as many prescriptions as possible.

## P. Walmart Tries To Avoid Criminal Prosecution.

In May 2018, the U.S. Attorney for the Eastern District of Texas informed Walmart that it planned to criminally indict the company for its role in the opioid epidemic. Walmart's directors had ignored those red flags, but the threat of a criminal indictment generated a response.

First, Walmart amended its pharmacy operating manual. Rewriting procedures and creating new documents is relatively easy, and the new manual detailed a number of prescriber and patient red flags. Walmart also sought to capture the public-relations high ground by issuing a press release titled, "Walmart Introduced Additional Measures to Help Curb Opioid Abuse And Misuse." Ex. H. The press release promised that within the next sixty days, Walmart would restrict initial acute opioid prescriptions to no more than a

seven-day supply. That was a step Walmart could have taken in 2014, when the Audit Committee saw the photograph showing a Walmart pharmacy with scores of patrons waiting in line at 7:00 a.m., two hours before the pharmacy opened, to fill their prescriptions for Oxycodone. Or Walmart could have taken that step in 2016 or 2017, when plaintiffs were filing the thousands of lawsuits that led to the Opioid MDL, or in December 2016, when Walmart learned that the U.S. Attorney's Office was conducting a criminal investigation. Walmart also announced in its press release that in just under two years (starting in January 2020), it would require e-prescriptions for controlled substances.

Next, Walmart sought to negotiate a settlement with the Eastern District of Texas. Those efforts proved unsuccessful, and in July 2018, the U.S. Attorney's Office reiterated its intention to indict Walmart.

After the failure to achieve a settlement, the Board implemented a policy under which pharmacists gained access to the refusal-to-fill information in Walmart's pharmacy management system. In an email dated July 29, 2018, Jacob Creel, Walmart's Director for U.S. Ethics and Compliance for Health and Wellness Practice Compliance, explained that although Walmart's Archer system collected and stored refusal-to-fill forms, Walmart's pharmacists "do not have easy access to this information, especially if the pharmacist is from another store," even though it "could be used to clear red flags, or identify red flags

51

that may indicate that the prescription was not issued for a legitimate medical reason."[45] Walmart also announced that its pharmacists would have access to NarxCare, a controlled substance tracking tool, in states where the system was available. Still seeking to capture the public-relations high ground, Walmart issued a press release announcing these initiatives. *See* Ex. 65 at '995; *see also* Ex. 12 at 4.

Having taken these steps, Walmart contacted its friends in Washington, D.C. In August 2018, Walmart's counsel sent a letter to senior DOJ officials asking them to quash the indictment. Throughout the balance of 2018 and well into 2019, Walmart continued its lobbying efforts. In September 2019, Walmart's counsel sent another letter, this time to the co-head of an opioid working group made up of DOJ officials and fifteen U.S. Attorneys' Offices. The group was evaluating potential lawsuits against Walmart and other participants in the opioid epidemic, and Walmart threatened to stop producing documents to the group.

Around the same time, Walmart hired Rachel Brand, the DOJ's former Associate Attorney General. Brand became the point-person for an "internal investigation regarding controlled substances." Ex. 71. Brand updated the Audit Committee on the investigation during Audit Committee meetings in April, May, and July 2018. *See* Exs. 71–73. Both

---

[45] Compl. ¶ 255 (citing Plaintiffs Trial Exhibit P-26705_00001, *In re: Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804-DAP (N.D. Ohio Nov. 8, 2021), ECF No. 4128-31).

Flynn and Brand updated the full Board during a "Legal Private Session" on November 8, 2019. Ex. 74 at 6. Walmart redacted or withheld everything about the investigations based on the attorney-client privilege and work product doctrine.

Shortly thereafter, the U.S. Attorney for the Eastern District of Texas was instructed by the highest levels of the DOJ to drop the criminal indictment and any civil complaint against Walmart. In October 2019, the head of the Civil Division of the U.S. Attorney's Office for the Eastern District of Texas resigned in protest.

## Q.    The *ProPublica* Article

In March 2020, *ProPublica* published an article detailing Walmart's role in the opioid epidemic. Before the article was published, Walmart's stockholders did not know about the DEA Settlement. The article revealed that between 2000 and 2018, the DEA sent fifty letters of admonition to Walmart about its dispensing practices. The article reported that multiple pharmacists had raised concerns about pill-mill doctors, well before the DEA Settlement expired.

On April 14, 2020, the Board met virtually. There was no discussion of compliance issues in the Health and Wellness Division. Ex. 78.

On September 14, 2020, Walmart issued a nine-page report summarizing "important components of Walmart's response to the opioid crisis and the Board's oversight of Walmart's activities related to the dispensing of prescription opioid medications in the United States." *See* Ex. 12 at 1. The report asserted that "[a]s a whole and through its committees, Walmart's Board of Directors oversees Walmart's risk management policies

53

and practices, including related [sic] to prescription opioids." *Id.* According to the report, the Board oversaw Walmart's "risk tolerance" and received "regular reports from Board committee chairpersons and members of senior management regarding risk related matters." *Id.* The report discussed the Audit Committee's oversight of global compliance and emphasized that the committee consisted "solely of independent directors." *Id.* Taken at face value, the report describes a good compliance program. The report does not identify when the various components of the program went into effect. The report did not engage with the compensation programs and other incentive structures that can overwhelm the most well-intentioned compliance program.

When it came to identifying steps that Walmart actually took to respond to the opioid crisis, the report highlighted the availability of NarxCare. The report then discussed Walmart's deference to its pharmacists' discretion in refusing to fill orders:

> We support our pharmacists when they exercise their professional judgment not to fill a controlled substance. Individual Walmart pharmacists may refuse to fill a particular prescription of concern (known as a "refusal to fill" or "RTF"), based on the presence of certain unresolved "red flags" (warning signs that a prescription might not be for a legitimate medical purpose) or combinations of unresolved red flags. If a pharmacist has more general concerns about a prescriber's controlled-substance prescribing practices, the pharmacist may refuse to fill all controlled-substance prescriptions written by that provider (a "blanket refusal to fill" or "BRTF").

*Id.* at 4.

The policy that Walmart claimed to follow contrasts starkly with the allegations regarding Walmart's actual practices. At best, the press release described the policy that the Board believed it had implemented in July 2018 when it faced a threat of indictment.

54

**R.** **The DOJ Sues Walmart, And Walmart Sues The DOJ.**

In October 2020, Walmart sued the DOJ and the Attorney General in the U.S. District Court for the Eastern District of Texas. *Walmart, Inc. v. Barr*, No. 4:20-cv-817-SDJ (E.D. Tex.). Walmart sought the following declaratory judgments:

- Pharmacists may be liable under the Controlled Substances Act and its regulations only when they fill a prescription that they know was not issued for a legitimate medical purpose by a prescriber acting in the usual course of the prescriber's professional practice or when pharmacists knowingly abandon all professional norms;

- The Controlled Substances Act does not require pharmacists to second-guess a registered and licensed doctor's decision that a prescription serves a legitimate medical purpose;

- The Controlled Substances Act and its regulations do not require pharmacists to refuse to fill entire categories of prescriptions without regard to individual facts and circumstances;

- The Controlled Substances Act and its regulations do not require pharmacists to document in writing why filling a prescription was appropriate;

- Pharmacies do not have an affirmative obligation under the Controlled Substances Act and its regulations to analyze and share aggregate prescription data across its stores and with line pharmacists;

- Pharmacies do not have an affirmative obligation under the Controlled Substances Act and its regulations to impose corporation-wide refusals-to-fill for particular doctors;

- The Controlled Substances Act and its regulations do not require distributors not to ship suspicious orders after reporting them;

- The Controlled Substances Act and its regulations did not impose monetary penalties for failure to report suspicious orders to DEA during the time Walmart self-distributed; and

55

- Defendants must follow their own regulations and may not base any enforceable legal positions on the alleged violation of agency guidance rather than obligations found in a statute or duly promulgated rule or regulation.[46]

Each of these declarations sought judicial approval for the business plan that Walmart had followed. The federal judge overseeing the Opioid MDL had ruled against Walmart on many of these issues. Through its complaint, Walmart sought to relitigate those losses.

Two months later, the DOJ filed a civil complaint against Walmart in the U.S. District Court for the District of Delaware (the "DOJ Action").[47] The DOJ sought injunctive relief to restrain Walmart's continuing violations of the law and alleged that Walmart repeatedly violated the Controlled Substances Act, both as a pharmacy operator and as a wholesale distributor. Compl. ¶¶ 300, 350; Dkt. 40 at 24.

The DOJ alleged that from June 2013 to November 2017, while acting as a distributor of controlled substances, Walmart shipped an estimated 37.5 million orders to its pharmacies. Walmart reported only 2,014 suspicious orders to the DEA. By comparison, Walmart's backup distributor, McKesson Corporation, reported more than 13,000 suspicious orders from Walmart's pharmacies during the same period, despite shipping far fewer doses. Compl. ¶ 25.

---

[46] Compl. ¶¶ 281, 286; *accord Walmart Inc. v. U.S. Dep't of Justice*, 21 F.4th 300 (5th Cir. 2021).

[47] *See U.S. v. Walmart Inc.*, No. 1:20-cv-01744-CFC (D. Del.).

In response, Walmart publicly accused the DOJ of "blaming pharmacists for not second-guessing the very doctors the Drug Enforcement Administration (DEA) approved to prescribe opioids." *See* Public Statement, Walmart Inc., Walmart Statement in Response to DOJ Lawsuit (Dec. 22, 2020). Walmart bragged about having sued the federal government, claiming: "Walmart already sued the Department and DEA to stand up for our pharmacists, and we will keep defending our pharmacists as we fight this new lawsuit in court." *Id.* Walmart claimed it "always empowered pharmacists to refuse to fill problematic opioids prescriptions," unlike the "DEA's well-documented failures in keeping bad doctors from prescribing opioids in the first place." *Id.*

**S.       Liability In Opioid MDL And Dismissal Of The Suit Against The DOJ**

On November 23, 2021, after six weeks of trial, a jury in the Opioid MDL found that two Ohio counties "prove[d]" that Walmart "engaged in intentional and/or illegal conduct which was a substantial factor" in the "oversupply of legal prescription opioids, and diversion of those opioids into the illicit market outside of appropriate medical channels."[48] The jury found that "widespread prevalence of opioid use disorder . . . and addiction" was "the direct and foreseeable result of the oversupply of legal prescription opioids, and diversion of these opioids . . . , caused by [Walmart's] wrongful conduct." *Id.* at *13. The jury also found that Walmart engaged in improper dispensing conduct" as "evidenced by [its] systemic failures to investigate and resolve red-flag prescriptions . . . ."

---

[48] *Opioid MDL Abatement Decision*, 2022 WL 3443614 at *4.

*Id.* at \*30. "[S]pecific evidence . . . demonstrated that [Walmart] dispensed massive quantities of red-flagged prescriptions without taking adequate measures to investigate or otherwise ensure the prescriptions were appropriately dispensed." *Id.* From this, "[t]he jury reasonably concluded that [Walmart] dispensed opioids without having in place effective controls and procedures to guard against diversion—controls and procedures they knew were required and knew they had not adequately employed." *Id.* at \*32.

During the trial, the jury heard from Susanne Hiland, a Walmart employee from the Health and Wellness Division, who observed that Walmart did not provide enough funding to pursue anti-diversion initiatives. During her testimony, Hiland confirmed that, as late as March 4, 2016, regional directors did not have access to refusal-to-fill reports. Hiland also confirmed that pharmacists could not determine from Walmart's prescription-filling system whether another Walmart pharmacy had refused to fill the prescription. Compl. ¶ 253–254.

In advance of the trial, the judge in the Opioid MDL had denied Walmart's motion for summary judgment. He held that record evidence concerning the suspicious order monitoring program that Walmart had in place in February 2015 "suggests obvious deficiencies that a layperson could plainly recognize." *Opioid MDL SJ Decision*, 2020 WL 425965, at \*2 n.12; *see* Compl. ¶¶ 295–296.

Walmart issued a fervid response to the jury's verdict:

We will appeal this flawed verdict, which is a reflection of a trial that was engineered to favor the plaintiffs' attorneys and was riddled with remarkable legal and factual mistakes. . . . Plaintiffs' attorneys sued Walmart in search

58

of deep pockets while ignoring the real causes of the opioid crisis—such as pill mill doctors, illegal drugs, and regulators asleep at the switch—and they wrongly claimed pharmacists must second-guess doctors in a way the law never intended and many federal and state health regulators say interferes with the doctor-patient relationship. As a pharmacy industry leader in the fight against the opioid crisis, Walmart is proud of our pharmacists, who are dedicated to helping patients in the face of a tangled web of conflicting federal and state opioid guidelines.[49]

Walmart once again portrayed itself as a champion of its pharmacists. By contrast, the pleading-stage record supports an inference that during the term of the DEA Settlement and continuing at least through the threatened criminal indictment in 2018, Walmart pursued a business strategy that sought to maximize the number of prescriptions that its pharmacists filled as a tool for generating higher profits, while at the same time depriving its pharmacists of the resources they needed to perform their jobs.

After the jury verdict, the federal court held a bench trial to determine the appropriate remedy. In August 2022, the court directed Walmart, CVS, and Walgreens to pay $650.6 million into an abatement fund.[50] The court entered an injunction order requiring Walmart to adopt reforms to remediate deficient controls and reporting systems

---

[49] *See* Public Statement, Walmart Inc., Statement by Walmart Inc. with respect to the Jury Verdict in the Liability phase of a Single, Two County Trial in the Multidistrict Litigation in the U.S. District Court for the Northern District of Ohio involving Opioids (Nov. 23, 2021).

[50] Judgment Order, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804 (N.D. Ohio Aug. 22, 2022), 2022 WL 4099669, *appeal pending*, *Trumbull Cnty., Ohio v. Purdue Pharma, L.P.*, No. 22-3753 (6th Cir.).

that failed to achieve substantial compliance with the Controlled Substances Act.[51] The fact that the federal court ordered Walmart to remediate its controls supports an inference that Walmart's controls and reporting systems were still noncompliant in August 2022.

Meanwhile, on February 4, 2021, the U.S. District Court for the Eastern District of Texas dismissed Walmart's complaint against the DOJ on the grounds that the DOJ enjoyed sovereign immunity. Walmart lost again on appeal. *See Walmart Inc. v. U.S. Dep't of Justice*, 21 F.4th 300, 305 (5th Cir. 2021).

## T.     The Books And Records Action

On May 4, 2020, two months after the *Pro Publica* article, two of the three plaintiffs sent Walmart a demand to inspect books and records under Section 220. Walmart rejected the demand in its entirety. *See* Compl. ¶¶ 57–63.

On June 17, 2020, Plaintiff Police and Fire Retirement System of the City of Detroit pursued its enforcement actions.[52] Plaintiff Norfolk County Retirement System pursued its enforcement action on the same date.[53] Plaintiff Ontario Provincial Council of Carpenters'

---

[51] Injunction Order, *In re Natl Prescription Opiate Litig.*, No. 1:17-MD-2804 (N.D. Ohio Aug. 17, 2022), ECF No. 4611-1, *appeal pending*, *Trumbull Cnty., Ohio v. Purdue Pharma*, L.P., No. 22-3753 (6th Cir.).

[52] *See* Verified Complaint Pursuant to 8 *Del. C.* 220 to Compel Inspection of Books and Records, *Police & Fire Ret. Sys. of City of Detroit v. Walmart Inc.*, C.A. No. 2020-0478-JTL, Dkt. 1 (Del. Ch. June 17, 2020).

[53] *See* Verified Complaint Pursuant to 8 *Del. C.* 220 to Compel Inspection of Books and Records, *Norfolk Cnty. Ret. Sys. v. Walmart Inc.*, C.A. No. 2020-0482-JTL, Dkt. 1 (Del. Ch. June 17, 2020).

Pension Trust Fund filed its enforcement action on August 21, 2020.[54] The three plaintiffs agreed to coordinate their Section 220 actions. On October 19, 2020, the court found that Walmart lacked any reasonable basis to dispute the proper purpose element for production under Section 220 and that the plaintiffs were entitled to many of Walmart's books and records that they requested. *See Walmart*, C.A. No. 2020-0478-JTL, Dkt. 37 at 50–51. By final order dated October 29, 2020, the court required Walmart to produce various categories of documents. *See Walmart*, C.A. No. 2020-0478-JTL, Dkt. 39.

On January 27, 2021, Walmart purported to complete its production of books and records and produced a certification of completeness. The plaintiffs asserted that Walmart's Section 220 production and its privilege log were utterly deficient. After additional correspondence between the parties, Walmart produced a revised privilege log on April 9, 2021, and a supplemental production on April 12, 2021.

## U. This Litigation

The plaintiffs filed their initial complaint on September 27, 2021. Dkt. 1. The complaint was thorough and evidenced considerable effort. It was 135 pages long and contained 316 numbered paragraphs. It was not a pastiche of prolix invective, but rather a detailed effort to assert viable derivative claims.

---

[54] *See* Verified Complaint Pursuant to 8 *Del. C.* 220 to Compel Inspection of Books and Records, *Ontario Provincial Council of Carpenters' Pension Trust Fund v. Walmart Inc.*, C.A. No. 2020-0697-JTL, Dkt. 1 (Del. Ch. Aug. 21, 2020).

The defendants moved to dismiss the complaint in its entirety, and the plaintiffs filed an amended complaint as contemplated by Court of Chancery Rule 15(aaa). The plaintiffs filed the currently operative complaint on February 22, 2022. Dkt. 23. It is 162 pages long and contains 379 numbered paragraphs. It names as defendants eight members of the Board and two Walmart officers who were not on the Board. Three members of the Board also served as company officers, as defined by Walmart's bylaws.

In Count I, the operative complaint asserts that the directors breached their fiduciary duties by consciously failing to ensure that Walmart complied with the Controlled Substances Act and the DEA Settlement. Compl. ¶ 363. The complaint alleges that the directors also failed to make a good faith effort "to implement and monitor internal reporting policies and systems." *Id.* ¶ 364.

In Count II, the operative complaint asserts that the officers breached their fiduciary duties in the same manner as the directors. An additional, officer-specific theory asserts that the officers breached their fiduciary duties "by failing to inform the Board about Walmart's regulatory compliance failures in dispensing and self-distributing opioids." *Id.* ¶ 375.

On June 24, 2022, Walmart moved to dismiss the amended complaint in its entirety. Walmart argued that the plaintiffs' claims were time-barred, that the plaintiffs had not established demand futility under Rule 23.1, and that the claims against two of the officer defendants should be dismissed under Rule 12(b)(6). Alternatively, Walmart requested a

stay of litigation pending resolution of the DOJ Action. On September 28, 2022, the court heard oral argument on this motion.

## V.  The Nationwide Settlement

On November 15, 2022, Walmart announced that it had agreed to the Nationwide Settlement, which it described as "a $3.1 billion nationwide opioid settlement framework designed to resolve substantially all opioid lawsuits and potential lawsuits by state, local, and tribal governments, if all conditions are satisfied."[55] If the conditions for the Nationwide Settlement are met, then Walmart's directors and officers will be released from liability to the signatory plaintiffs. PSB Ex. A § I.P.

The Nationwide Settlement did not resolve all of the opioid cases involving Walmart. Most notably, the DOJ Action remains pending.

In the Nationwide Settlement, Walmart denied all claims and allegations of wrongdoing. At the same time, Walmart agreed to implement expansive procedures and controls, including procedures to avoid diversion of controlled substances. It is reasonable to infer that before the Nationwide Settlement, even though Walmart had taken some steps to improve its oversight policies, its controls remained inadequate. Otherwise, the controls could not have been part of the consideration for the settlement.

---

[55] Press Release, Walmart, Inc., Walmart Announces Nationwide Opioid Settlement Framework (Nov. 15, 2022).

By letter dated as of November 21, 2022, the court asked the parties to address whether the settlement had implications for the court's consideration of the pending motions. The parties submitted supplemental briefs on that topic on January 13, 2023.

This decision addresses the defendants' motion to dismiss the complaint pursuant to Court of Chancery Rule 23.1—on the grounds that the plaintiff did not make a demand on the board and failed to plead that demand would have been futile—and pursuant to Court of Chancery Rule 12(b)(6). This decision also addresses the defendants' request to stay the proceedings.

## II.     LEGAL ANALYSIS

The director defendants have moved to dismiss the complaint under Court of Chancery Rule 23.1 for failure to plead demand futility. In its entirety, Rule 23.1(a) states:

> In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall allege that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort.

The innocuous language of the second sentence supports the edifice of Rule 23.1 jurisprudence. *See Lebanon Cnty. Empls' Ret. Fund v. Collis* (*Collis Demand Decision*), 2022 WL 17841215, at *13 (Del. Ch. Dec. 22, 2022).

Rule 23.1's second sentence is the "procedural embodiment" of substantive principles of Delaware law. *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993). When a corporation suffers harm, the board of directors is the institutional actor legally empowered to determine what, if any, remedial action the corporation should take, including pursuing litigation against the individuals involved. *See* 8 *Del. C.* § 141(a). "A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984).[56] "Directors of Delaware corporations derive their managerial

---

[56] In *Brehm v. Eisner*, 746 A.2d 244, 253–54 (Del. 2000), the Delaware Supreme Court overruled seven precedents, including *Aronson* to the extent that they reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *Brehm*, 746 A.2d at 253 n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch.*, 701 A.2d 70, 72–73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984); and *Aronson*, 473 A.2d at 814). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. *Brehm*, 746 A.2d at 254. The seven partially overruled precedents otherwise remain good law. This decision does not rely on any of them for the standard of appellate review. Having described *Brehm*'s relationship to these cases, this decision omits their cumbersome subsequent history.

More recently, the Delaware Supreme Court overruled *Aronson* and *Rales*, to the extent that they set out alternative tests for demand futility. *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021). The high court adopted a single, unified test for demand futility. Although the *Zuckerberg* test displaced the prior tests, cases properly applying *Aronson* and *Rales* remain good law. *Id.* This decision therefore does not identify any precedents, including *Aronson* and *Rales*, as having been overruled by *Zuckerberg*.

decision making power, which encompasses decisions whether to initiate, or refrain from entering, litigation, from 8 *Del. C.* § 141(a)." *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981) (footnote omitted). "The board's authority to govern corporate affairs extends to decisions about what remedial actions a corporation should take after being harmed, including whether the corporation should file a lawsuit against its directors, its officers, its controller, or an outsider." *Zuckerberg*, 262 A.3d at 1047.

"In a derivative suit, a stockholder seeks to displace the board's decision-making authority over a litigation asset and assert the corporation's claim." *Id.* (cleaned up). Unless the board of directors permits the stockholder to proceed, a stockholder only can pursue a cause of action belonging to the corporation if (i) the stockholder demanded that the directors pursue the corporate claim and they wrongfully refused to do so, or (ii) demand is excused because the directors are incapable of making an impartial decision regarding the litigation. *Id.*

Rule 23.1 imposes a pleading requirement so that demand principles can be applied at the outset of a case to determine whether the plaintiff has standing to sue. *See id.* at 1048. To satisfy the pleading requirements of Rule 23.1, the plaintiff "must comply with stringent requirements of factual particularity that differ substantially from . . . permissive notice pleadings . . . ." *Brehm*, 746 A.2d at 254. Under the heightened pleading requirements of Rule 23.1, "conclusionary [sic] allegations of fact or law not supported by allegations of specific fact may not be taken as true." *Grobow*, 539 A.2d at 187.

66

"When considering a motion to dismiss a complaint for failing to comply with Rule 23.1, the Court does not weigh the evidence, must accept as true all of the complaint's particularized and well-pleaded allegations, and must draw all reasonable inferences in the plaintiff's favor." *Zuckerberg*, 262 A.3d at 1048. Rule 23.1 requires that a plaintiff allege specific facts, but "he need not plead evidence." *Aronson*, 473 A.2d at 816; *accord Brehm*, 746 A.2d at 254 ("[T]he pleader is not required to plead evidence.").

The plaintiffs in this case chose not to make a pre-suit demand that asked the Board to consider asserting the claims in their complaint. The question under Rule 23.1 is therefore whether "demand is excused because the directors are incapable of making an impartial decision regarding whether to institute such litigation." *Stone v. Ritter*, 911 A.2d 362, 367 (Del. 2006).

When conducting a demand futility analysis, a Delaware court proceeds on a claim-by-claim and director-by-director basis.[57] As to each claim, the court asks for each director,

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and

---

[57] *See, e.g.*, *Khanna v. McMinn*, 2006 WL 1388744, at \*14 (Del. Ch. May 9, 2006) ("This analysis is fact-intensive and proceeds director-by-director and transaction-by-transaction."); *Beam v. Stewart*, 833 A.2d 961, 977 n.48 (Del. Ch. 2003) ("Demand futility analysis is conducted on a claim-by-claim basis"), *aff'd*, 845 A.2d 1040 (Del. 2004).

> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

*Zuckerberg*, 262 A.3d at 1059. "If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile" for purposes of that claim. *Id.* If another set of claims arises out of a different nucleus of operative facts or concerns a different transaction, then the court moves on to the next claim and repeats the process.

How to organize the analysis in this case presents a challenge. The plaintiffs have advanced three species of claims:

- The plaintiffs assert that Walmart's directors and officers knew that Walmart was not complying with the Controlled Substances Act and the DEA Settlement and made conscious decisions to prioritize profits over legal compliance, thereby intentionally choosing to violate the law (the *"Massey* Claim").

- The plaintiffs assert that Walmart's directors and officers were put on notice by a steady stream of red flags indicating that Walmart was failing to comply with its obligations under the Controlled Substances Act and the DEA Settlement, yet consciously ignored those warnings (the *"Red-Flags* Claim").

- The plaintiffs assert that Walmart's directors and officers knew they had an obligation to establish information systems sufficient to enable them to monitor Walmart's compliance with the Controlled Substances Act and the DEA Settlement, yet consciously failed to make a good faith effort to fulfill that obligation (the "Information-Systems Claim").

The plaintiffs seek to apply these claims to three categories of alleged wrongdoing.

- The plaintiffs maintain that the directors and officers breached their fiduciary duties in connection with Walmart's failures to fulfill its obligations as an opioid dispenser under the DEA Settlement (the "DEA Settlement Issues").

68

- The plaintiffs maintain that the directors and officers breached their fiduciary duties in connection with Walmart's failures to comply with its obligations as an opioid dispenser under the Controlled Substances Act (the "Pharmacy Issues").

- The plaintiffs maintain that the directors and officers breached their fiduciary duties in connection with Walmart's failures to comply with its obligations as an opioid distributor under the Controlled Substances Act (the "Distributor Issues").

Three different legal theories applied to three categories of wrongdoing work out to nine separate claims.[58]

Now add the directors. When the plaintiffs filed this action, the Board had twelve members (the "Demand Board"). Eight are defendants: S. Robson Walton, Gregory Penner, Steuart Walton, Douglas McMillon, Steven Reinemund, Timothy Flynn, Marissa Mayer, and Thomas Horton. Four are not defendants: Carla Harris, Sarah Friar, Cesar Conde, and Randall Stephenson. To adequately allege demand futility, the plaintiffs must plead particularized facts that provide a reason to doubt that at least six members of the Demand Board could have objectively considered a demand to assert the claims advanced in the complaint.

---

[58] This decision makes one simplifying assumption. During the term of the DEA Settlement, both the DEA Settlement Issues and the Pharmacy Issues are in play. The plaintiffs understandably prioritize the DEA Settlement during its term of existence: Through that agreement, Walmart made specific and enforceable commitments to its primary regulator about establishing and maintaining a compliance system, and Walmart agreed to a time frame for accomplishing its commitments. This decision therefore focuses on the DEA Settlement Issues for the period of time when the DEA Settlement was in effect. There is no need to review the same time period a second time under the guise of the Pharmacy Issues.

The plaintiffs seek to establish that the eight directors named as defendants could not have properly considered a demand. A thorough and methodical march through the combinations would result in seventy-two different units of analysis (3 claims * 3 issues * 8 directors). That would be painful to write and even more painful to read.

In an attempt to make the analysis more manageable, this decision starts by discussing the common features that unite a *Massey* Claim, a Red-Flags Claim, and an Information-Systems Claim. At bottom, each is a means of identifying bad faith conduct, and although the claims nominally target different types of culpable action, the difference is one of degree, not of kind. Treating each type of claim as distinct can be analytically helpful. In a case like this one, it can be burdensome. The more efficient path is to examine each category of underlying misconduct and ask whether the particularized facts support an inference that the directors acted in bad faith, using the three species of claims as paradigms to guide the analysis, rather than as forms of action that the allegations must fit.

## A.    Three Similar Claims

A *Massey* Claim, a Red-Flags Claim, and an Information-Systems Claim each rest on the same concept: a breach of the duty of loyalty grounded on bad faith action. Each also strives to address situations where the defendant fiduciaries have not made a single, easily identifiable decision, such as a decision to sell the company or approve a self-interested transaction. "Instead, there will be a period of time (perhaps prolonged) marked by a combination of inaction and occasional action, followed by a corporate trauma in which the corporation suffers substantial harm." *Ontario Provincial Council of*

*Carpenters' Pension Tr. Fund v. Walton* (*Walmart Laches*), 2023 WL 2904946, at \*18 (Del. Ch. Apr. 12, 2023). The core question in that setting is whether there is a basis to hold the corporate fiduciaries accountable for allowing the trauma to happen. *Id.*

Intuitively, the concept of allowing a corporate trauma to happen sounds like negligence, perhaps even gross negligence, but in any event an inquiry grounded in the duty of care. Corporate fiduciaries might have caused the trauma by making decisions that led to a tragic outcome, but disinterested and independent directors who were not also sociopaths would not intentionally cause a corporate trauma to happen. It follows that the duty of oversight generally derives from the duty of care, rather than from the duty of loyalty. In *Graham v. Allis Chalmers Manufacturing Co.*, the Delaware Supreme Court's initial foray into this area, the justices seemed to envision that oversight liability might result from a breach of either the duty of loyalty or the duty of care. 188 A.2d 125, 130 (Del. 1963). In his landmark decision in *Caremark*, Chancellor Allen also seemed to contemplate both paths, and he most often framed the duty of oversight in the language of care. *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 960, 964, 967, 671 (Del. 1996). In one passage, however, he posited that liability only would exist if the oversight failure was sufficiently egregious such that a court could infer that the directors had acted in bad faith. *Id.* at 971. Writing as a member of this court, Chief Justice Strine took up the question and held that liability for a breach of the duty of oversight always derives from the duty of loyalty, with no room for care. *See Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003). The Delaware Supreme Court subsequently adopted that formulation and held that a breach

of the duty of loyalty, such as action in bad faith, is a "necessary condition to liability." *Stone*, 911 A.2d at 369–70.

An Information-Systems Claim, a Red-Flags Claim, and a *Massey* Claim each operate within that loyalty-based framework. An Information-Systems Claim and a Red-Flags Claim become loyalty-based through the premise that a conscious decision not to act is just as much of a decision as an affirmative act and thus can be the product of bad faith. The *Massey* Claim looks for or implies an affirmative decision to violate the law, which is similarly a decision to act in bad faith. *See Walmart Laches*, 2023 WL 2904946, at *21.

Sophisticated and well-advised individuals do not formally document bad faith decisions, so rarely will there be direct evidence to support an Information-Systems Claim, a Red-Flags Claim, or a *Massey* Claim. Instead, for each theory, "the court looks at a series of fiduciary inactions and actions, made over time, to determine whether they support an inference that the corporate fiduciaries were operating in bad faith." *Id.*

- A strong pattern of conduct can support an inference that the corporate fiduciaries intentionally decided to cause the corporation to violate the law, typically because the costs and other burdens associated with compliance would cut into profits. "The inference that corporate fiduciaries made a decision to violate the law is the foundation for a *Massey* Claim." *Id.*

- A less strong pattern of conduct can support an inference that the corporate fiduciaries were put on notice that the corporation was violating the law or otherwise headed for a corporate trauma, but willfully ignored the evidence and consciously decided to do nothing. "That inference is the foundation for a Red-Flags Claim." *Id.*

- A final pattern of conduct addresses the situation where information did not reach the corporate fiduciaries. If the corporate trauma resulted from a central compliance area that fiduciaries acting in good faith would monitor, and if the corporate fiduciaries did not have a monitoring system that reflects a good faith effort to bring

72

timely and actionable information to their attention, then the absence of such a system may support an inference that the corporate fiduciaries willfully blinded themselves to a known risk. "That inference is the foundation for an Information-Systems Claim." *Id.*

In practice, the three theories are not so different after all. Each involves looking at the pleading-stage record, using the innate human capacity to deploy the theory of mind, and drawing inferences about what the corporate fiduciaries could have believed or intended. *See id.*

Because of their similarities, plaintiffs often try to plead the theories in the alternative. Simultaneously advancing both a Red-Flags Claim and an Information-Systems Claim can seem counterintuitive, because to successfully plead a Red-Flags Claim requires facts supporting an inference that red flags reached the relevant fiduciary, and the fact that the red flags reached the fiduciary may suggest that an information system existed. But that will not always be so. Warnings or indications may reach the board episodically or by happenstance, without the directors having implemented an appropriate board-level system of protocols and processes designed to generate timely and actionable information. *See Marchand v. Barnhill*, 212 A.3d 805, 809 (Del. 2019). Or a red flag may come from outside the corporation. In *Boeing*, the first crash of the 737 MAX was a blazing red flag, and the Boeing directors did not need an internal information system to learn about it. Nor did that horrific form of notice suggest that the Boeing board had adequate reporting systems in place. *See In re Boeing Co. Deriv. Litig.*, 2021 WL 4059934, at *33–34 (Del.

Ch. Sept. 7, 2021). There would be no impediment to asserting both species of claims in those types of scenarios.

An Information-Systems Claim and a Red-Flags Claim can also coexist when an issue becomes more serious over time. Envision that a fiduciary may have failed to try to put an information system in place for a particular risk. Time and attention are scarce commodities, and that decision initially could be a proper exercise of business judgment. The decision might then become dubious as evidence accretes indicating that the risk has evolved into a core compliance risk. Once a tipping point is reached, the fiduciary's failure to implement an information system could support an Information-Systems Claim. After a fortunate period without a corporate trauma, notwithstanding the absence of an information system, a red flag may put the fiduciary on notice about an area of legal noncompliance or a threat of serious harm. If the fiduciary does nothing and a corporate trauma results, then an Information-Systems Claim may exist for the full period from the tipping point through the corporate trauma, and a Red-Flags Claim may exist for the period after the red flag through the corporate trauma.

Simultaneously advancing a *Massey* Claim with either a Red-Flags Claim or an Information-Systems Claim poses fewer conceptual difficulties. A *Massey* Claim requires an aggregation of pled facts sufficient to support an inference that a corporate fiduciary made a conscious decision to violate the law. The facts may include hallmarks of other claims, such as a persistent failure to implement a monitoring system for an obvious central compliance risk or a pattern of chancing upon red flags, yet persistently failing to act or

resorting to only cosmetic action. The most telling indications include steps to encourage,

enable, or profit from noncomplaint behavior.[59] At some point, a pattern that could provide

support for an Information-Systems Claim or a Red-Flags Claim may reach the level where

it supports an inference that the board was consciously condoning illegal conduct.

The line between the claims can also blur because of the distinction between legal

risk and illegality. A core part of a director's job is to identify and assess risk, including

legal risk, and to make business judgments about whether a project is likely to increase the

long-term value of the corporation for the ultimate benefit of its stockholders. *See generally*

---

[59] *E.g.*, *Collis Demand Decision*, 2022 WL 17841215, at *8, 18 (discussing board approval of double trigger for suspicious order reporting that cut suspicious orders by two orders of magnitude); *La. Mun. Police Empls.' Ret. Sys. v. Pyott*, 46 A.3d 313, 352–53 (Del. Ch. 2012) (discussing board approval of business plan with targets that only could be achieved through company promotion of off-label uses), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013); *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 794-99 (Del. Ch. 2009) (Strine, V.C.) (multifaceted financial fraud), *aff'd sub nom. Teachers' Ret. Sys. of Louisiana v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011). *Cf. City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 68–69 (Del. 2017) (Strine, C.J., dissenting) (considering totality of company's recidivist violations of regulatory restrictions, reliance on political influence to reduce regulatory consequences, and regulators' rejection of settlement with company when deal was subjected to scrutiny). Other cases have upheld *Massey*-style oversight claims involving accounting improprieties or complicity in self-dealing. *See Stewart v. Wilm. Tr. SP Servs. Inc.*, 112 A.3d 271, 281, 301 (Del. Ch. 2015) (denying motion to dismiss by director who "went along without raising a peep" with a "fraudulent scheme year after year"); *ATR-Kim Eng. Fin. Corp. v. Araneta*, 2006 WL 3783520, at *1, *19 (Del. Ch. Dec. 21, 2006) (entering judgment against two directors who acted with "complicity" and as "stooges" for a controlling stockholder and board chair who engaged in self-dealing; holding outside directors liable for breach of the duty of loyalty in failing to monitor the controlling shareholder); *Saito v. McCall*, 2004 WL 3029876, at *1, 7 (Del. Ch. 20, 2004) (denying motion to dismiss oversight claim alleging that directors "presided over a fraudulent accounting scheme").

*Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *17–21 (Del. Ch. Apr. 14, 2017). Some projects involve more legal risk than others and, depending on the outcome, can expose the corporation to civil liability. When directors make a business decision that carries legal risk, but which otherwise involves legally compliant conduct, then the business judgment rule protects that decision. The same principle applies to a board's decision to act or not act in response to red flags. "Simply alleging that a board incorrectly exercised its business judgment and made a 'wrong' decision in response to red flags, however, is insufficient to plead bad faith." *Melbourne Mun. Firefighters' Pension Tr. Fund v. Jacobs*, 2016 WL 4076369, at *9 (Del. Ch. Aug. 1, 2016), *aff'd*, 158 A.3d 449 (Del. 2017). To establish the requisite inference of bad faith, a plaintiff would have to plead (and later prove) that the directors knew from the red flags that the corporate trauma was coming and nevertheless forged ahead for reasons unrelated to the best interests of the corporation. "The decision about what to do in response to a red flag is one that an officer or director is presumed to make loyally, in good faith, and on an informed basis, so unless one of those presumptions is rebutted, the response is protected by the business judgment rule." *McDonald's Directors*, 2023 WL 2293575, at *17.

What a corporate fiduciary cannot do, however, is make a business judgment to cause or allow the corporation to break the law. "Delaware law does not charter law breakers." *In re Massey Energy Co.*, 2011 WL 2176479, *20 (Del. Ch. May 31, 2011). As the *Massey* decision explains,

Delaware law allows corporations to pursue diverse means to make a profit, subject to a critical statutory floor, which is the requirement that Delaware corporations only pursue "lawful business" by "lawful acts." As a result, a fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law.

*Id.* at *20 (footnoted omitted). "[I]t is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully. The knowing use of illegal means to pursue profit for the corporation is director misconduct." *Desimone v. Barrows*, 924 A.2d 908, 934–35 (Del. Ch. 2007) (cleaned up). "[A] fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity." *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004).

The business judgment rule plays no role in a decision to proceed in a way that violates the law. As a result, there is a fundamental difference between the following two scenarios, each involving a legal assessment.

- In one hypothetical scenario, the lawyers say: "Although there is some room for doubt and hence some risk that our regulator may disagree, we believe the company is complying with its legal obligations and will remain in compliance if you make the business decision to pursue this project."

- In the other hypothetical scenario, the lawyers say: "The company is not currently in compliance with its legal obligations and faces the risk of enforcement action, and if you make the business decision to pursue this project, the company is likely to remain out of compliance and to continue to face the risk of an enforcement action. But the regulators are so understaffed and overworked that the likelihood of an enforcement action is quite low, and we can probably settle anything that comes at minimal cost and with no admission of wrongdoing."

In the former case, the directors can make a business judgment to pursue the project. In the latter case, the decision to pursue the project would constitute a conscious decision to

77

violate the law, the business judgment rule would not apply, and the directors would be acting in bad faith.

Because of the similarities among the three types of claims, this decision does not analyze each of the three categories of issues using each of the three legal frameworks. For each category, the core question is whether the plaintiffs have alleged particularized facts supporting an inference that the directors acted in bad faith. Reframed for purposes of demand futility under the second prong of *Zuckerberg*, the question is whether there is sufficient reason to think that the director acted in bad faith such that the director faces a substantial likelihood of liability. For two of the directors who are members of the Walton family, a question also arises about whether they can validly consider a demand to assert claims that would result in Robson Walton, a patriarch of the Walton family, facing a substantial likelihood of liability.

## B. The DEA Settlement Issues

The first category of alleged wrongdoing involves the DEA Settlement Issues. During the term of the DEA Settlement, the directors in office received a series of reports about Walmart's compliance with its requirements. The pleading-stage record supports an inference that the directors learned that Walmart was not complying with the DEA Settlement and could not achieve compliance before the agreement expired, yet consciously chose not to take action to achieve compliance, such as by instructing management to devote more resources to compliance initiatives. Walmart's redactions to its Section 220 documents contribute to this result, because they support an inference that,

as the reality of noncompliance became clearer and the term of the DEA Settlement loomed, Walmart's directors and officers did nothing other than talk with lawyers. Walmart's directors and officers did not have non-privileged discussions about the business issues that the situation presented, nor did they make non-privileged business decisions about what to do.

Importantly, the contention is not that Walmart did nothing on the compliance front. The pleading-stage record shows that Walmart initially drafted an extensive set of policies and procedures that described a nice-sounding compliance program for its pharmacies. Walmart eventually created an inventory control system that targeted internal diversion. But Walmart did not take the steps necessary to comply with the DEA Settlement. The pleading-stage record supports an inference that the directors knew about the noncompliance and allowed it to happen, meaning that they consciously condoned illegality.

The pleading-stage record also points to a motive for the conscious decision not to devote more resources to compliance: Walmart was driving opioid prescription traffic to its pharmacies both to generate pharmacy sales and get customers into Walmart's stores so that they would buy other products. Walmart was simultaneously incentivizing and pressuring its pharmacists to fill more prescriptions and do it faster. Devoting more resources to achieving compliance with the DEA Settlement would have cost money and undercut those initiatives.

79

## 1. The Director-by-Director Analysis

For demand futility, the dispositive issue is whether the complaint alleges particularized facts providing reason to doubt that a majority of the directors on the Demand Board could make a disinterested and independent decision about whether to assert claims relating to the DEA Settlement Issues. Conducting that inquiry requires a director-by-director analysis.

### a. S. Robson Walton

S. Robson Walton is the son of Walmart founder Sam Walton. He joined Walmart in 1969 and became a director in 1978. He served as Chairman (later Chairperson) of the Board from 1992 until 2015. Under Walmart's bylaws, the Chairman is an executive officer with particular responsibility for "focusing on oversight and governance matters."[60] As Chairman, Walton served as an executive officer while the DEA Settlement was in effect.[61]

---

[60] Wal-Mart Stores, Inc., Definitive Proxy Statement (Schedule 14A), at 33 (Apr. 23, 2014) ("Our Chairman, on the other hand, is charged with presiding over all meetings of the Board and our shareholders, and providing advice and counsel to the CEO and our company's other officers regarding our business and operations, as well as focusing on oversight and governance matters."); *see, e.g.*, *id.* ("Chairman: S. Robson Walton – presides over meetings of the Board and shareholders; provides advice and counsel to the CEO and other officers; focuses on oversight and governance matters"(formatting omitted)).

[61] *See* Walmart Inc., Amended and Restated Bylaws, Art. IV § 1 ("The officers of the Corporation shall consist of a President, a Chief Financial Officer, a Secretary and a Treasurer, and such other officers as the Board may appoint, including but not limited to a Chairman of the Board, a Chief Executive Officer, a Chief Operating Officer, one or more Executive Vice Presidents, one or more Senior Vice Presidents, one or more Vice Presidents, one or more Assistant Secretaries, and one or more Assistant Treasurers.").

The plaintiffs have pled facts supporting an inference that Walton knew about the DEA Settlement. He was Chairman when Walmart received the Order to Show Cause in November 2009, and he was Chairman when Walmart entered into the DEA Settlement in February 2011. Given Walton's responsibilities as Chairman and the material risk that losing Walmart's DEA licenses posed to its business, it is inconceivable that Walton did not know about those developments.

Through the DEA Settlement, Walmart committed to implement and maintain a compliance system for its pharmacies during the term of the DEA Settlement, which ran from March 11, 2011 to March 11, 2015. By August 2011, Walmart had created the paperwork necessary for a nice-sounding pharmacy compliance program, including policies and procedures for its pharmacists to follow. *See* Ex. 15. But by October 2011, the actual implementation of the program had foundered due to inadequate funding. *See* Ex. 82. In January 2012, the Audit Committee and the Executive Committee received the 2012 Memo, which reported that compliance efforts had fallen behind schedule and stated bluntly that "[s]ignificant compliance issues remain unresolved." Ex. 6 at '035. The 2012 Memo reported that "a proposed five-year plan" was "being developed," implying that a plan currently did not exist and forecasting that compliance could not be achieved until 2017, two years after the DEA Settlement expired. *Id.*

Walton was a member of the Executive Committee and received the 2012 Memo, which called out Walton as a recipient. It is reasonable to infer that Walton, the other members of the Executive Committee, and the members of the Audit Committee knew in

81

January 2012 that Walmart was failing to meet its obligations under the DEA Settlement and would not be able to achieve compliance within the term of that agreement.

In August 2012, Walton learned about more compliance issues when a whistleblower notified him that pharmacists were filling prescriptions for controlled substances that bore numerous red flags. That was the same behavior that led to the DEA Settlement in the first place. There is no indication in the record that Walton took action in response.

In April 2013, Walton attended a meeting of the Audit Committee. Ex. 10. Just a month earlier, the committee received another report about compliance in the Health and Wellness Division, this time from Harris. The report warned that the "diversion analytics tool to monitor suspicious controlled substance activity remains in a status of red," which indicated that the project had "major issues." Ex. 46 at '601. The report also showed that Walmart's Data Centralization project was in a status of red because Walmart had only purchased a limited amount of database capacity. One of the largest companies in the world was failing to achieve a core compliance goal because it had skimped on database capacity. It is reasonable to infer that the Audit Committee, Walton, and other meeting attendees discussed the March 2013 report at the April 2013 Audit Committee meeting. A properly motivated Audit Committee would have taken steps to ensure that the funds were provided. The pleading-stage record provides no indication that Walton or the Audit Committee took action.

Walton next attended a two-day meeting of the Board in September 2013, where the Chair of the Audit Committee reported to the Board about the status of Walmart's compliance initiatives. Ex. 47 at '207; *see* Ex. 7. The minutes are heavily redacted and provide no insight into the tenor of the discussion. At the pleading stage, the plaintiffs are entitled to an inference that the report conveyed the same message that the Audit Committee had received in March 2013, namely that key aspects of Walmart's compliance programs were not on track, that Walmart was not complying with the DEA Settlement, and that Walmart could not achieve compliance during the settlement's term. It is reasonable to infer that all of the directors then in office learned about those issues from that report. Walmart had used up two years and seven months of the four-year term and had only seventeen months left to comply with the DEA Settlement.

Other than creating the paperwork for a nice-sounding pharmacy compliance program, Walmart's one compliance success was implementing an internal anti-theft system for its pharmacies. By reducing internal theft, Walmart helped its bottom line.

For other aspects of pharmacy compliance, Walmart had a long way to go. Evidencing what was happening with prescription opioids, the head of compliance for the Health and Wellness Division provided the Audit Committee in March 2014 with a photograph from July 2012. That picture is worth a thousand procedures. It depicted scores of patrons waiting in line at 7:00 a.m., two hours before the pharmacy opened, with a "very high number of prescriptions for Oxycodone." Compl. ¶ 185. It was only in the lead-up to a March 2014 meeting that the Health and Wellness compliance team "began to assess our

83

processes" to avoid the "risk of our pharmacies becoming the pharmacy of choice for 'pill mills.'" *See* Ex. B at 8.

The time lag between the photograph and the report to the Audit Committee speaks volumes and supports an inference that Walmart had done nothing meaningful to address real-world problems at its pharmacies. Instead, Walmart had been taking steps to drive prescription traffic to its pharmacies while reducing the ability of its pharmacists to meet their Refusal-To-Fill Obligation. Management told the Audit Committee that *after* seeing the photograph, the compliance team had implemented additional operational controls in Florida, where the controls appeared to have had some effect. *See id.* at 10. There is no indication that the Audit Committee took any action in response to this disturbing report, such as requiring management to address what was happening in other states.

In June 2014, nine months before the DEA Settlement was scheduled to expire, the Health and Wellness Division evaluated the progress of Walmart's suspicious order monitoring project. *See* Ex. D. The assessment noted that a suspicious order monitoring system was not in place. *Id.* at '701 ("Is the Risk being mitigated today by manual, systemic, or a combination of both today (regardless of optimal or not)?"; "No."). The report identified the issue as "Board informed." *Id.* It is reasonable to infer that as Chairman of the Board, Walton was one of those on the Board who were informed.

In November 2014, Walton and the rest of the Board reviewed Walmart's compliance with the DEA Settlement. Walmart withheld the meeting minutes in their entirety on the basis of privilege. *See* Ex. 14 at Item No. 49. By doing so, Walmart

represented that the Board did not discuss any business topics, evaluate any business considerations, or make any business decisions. It is reasonable to infer from documents in the record that Walmart was not in compliance with the DEA Settlement, that the directors knew about it, and that they took no action in response.

The complaint contains factual allegations and incorporates documents supporting an inference that Walmart failed to achieve compliance with the DEA Settlement because it prioritized profits:

- Walmart underfunded the internal team charged with implementing the compliance projects necessary to comply with the DEA Settlement. Walmart provided only $11 million of funding rather than the $40 million that the team estimated was needed. Ex. 82 at '364.

- The slide deck that supported the 2012 Memo stated that the reboot of the Health and Wellness Division's compliance program needed "[s]easoned leadership that strikes the proper balance between business and compliance considerations." Ex. 6 at '040.

- Compliance efforts broke down in late 2012 and early 2013 because Walmart had failed to purchase enough database capacity to support a read-write database for pharmacy compliance. Ex. 46 at '601.

- In February 2015, one month before the DEA Settlement expired, one of Walmart's compliance directors for controlled substances told Walmart pharmacists that Walmart prioritized profits over compliance. Compl. ¶ 27.

- A Walmart employee from the Health and Wellness Division testified in the Opioid MDL trial that Walmart did not provide enough funding to pursue anti-diversion initiatives. *Id.* ¶ 253–254.

- Walmart engaged in substantial efforts to drive prescription opioid traffic to its pharmacies through trial offers, savings cards, e-coupons, and loyalty programs for opioids. *Id.* ¶¶ 115–119.

- Walmart created incentives for pharmacists to fill more prescriptions, including opioid prescriptions, while limiting the amount of time in which a pharmacist was expected to fill a prescription. *Id.* ¶¶ 119–120.

- Walmart delayed implementing a computer system that could help pharmacists identify red flags until 2015, then denied pharmacists access to the data in the system. *Id.* ¶¶ 25, 253, 255.

To be sure, none of these documents creates a direct connection to Walton or the Board, and there is no smoking gun at this stage of the case. Instead, the other documents in the pleading-stage record help explain why the directors consciously accepted Walmart's noncompliance with the DEA Settlement.

Walton was the Chairman during the term of DEA Settlement, a member of the Executive Committee, and a representative of the Walton family. It is reasonable to infer that he understood the course that Walmart was taking and approved the failure to comply with the DEA Settlement. It is reasonable to infer that he consciously accepted and approved Walmart's noncompliance with its obligations under the DEA Settlement.

Whether framed as a Red-Flags Claim or a *Massey* Claim, Walton faces a substantial risk of liability for acting in bad faith on the DEA Settlement Issues. He is not capable of considering a demand to assert those claims.

### b. Gregory Penner

Gregory Penner is Walton's son-in-law. After marrying into the Walton family in 2006, he took on increasing responsibilities at Walmart. He joined the Board in 2008, held a number of senior roles at Walmart from 2008 to 2014, and served as the Board's Vice Chairman from June 2014 to June 2015. Penner was thus a senior officer at Walmart during

the term of the DEA Settlement, and he served as Vice Chairman for the last nine months of the DEA Settlement. Like the position of Chairman, the position of Vice Chairman is an executive officer role. In June 2015, Penner succeeded Walton as Chairman, becoming the first Chairman who is not part of the Walton family by blood. Compl. ¶ 46.

The allegations about Penner largely parallel the allegations against Walton. Penner was on the Board for the same meetings and received the same information. The same conclusion applies regarding his substantial risk of liability for the DEA Settlement Issues. A reasonable doubt exists regarding his ability to consider a demand relating to those issues.

Penner is also not disinterested regarding the DEA Settlement Issues because of his family connections to Walton. "The existence of a very close family relationship between directors should, without more, generally go a long (if not the whole) way toward creating a reasonable doubt."[62] "While there is nothing wrong with family members serving together on a board, . . . a 'reasonable doubt' is raised when a demand would require a director to support a suit contrary to the interests of a close family member." *Mizel*, 1999 WL 550369, at *4. Delaware precedents have treated similar degrees of familial relationships between a director and a defendant who faces a substantial risk of liability as

---

[62] *Mizel v. Connelly*, 1999 WL 550369, at *4 (Del. Ch. July 22, 1999) (Strine, V.C.); *Harbor Fin. P'rs v. Huizenga,* 751 A.2d 879, 889 (Del. Ch.1999) (Strine, V.C.) ("Close familial relationships between directors can create a reasonable doubt as to impartiality."); *Grimes*, 673 A.2d at 1216–17 (noting that a "familial interest" can disable a director).

sufficient to render the director unable to consider a demand.[63] For that additional reason, a reasonable doubt exists about Penner's ability to consider a demand regarding the DEA Settlement Issues.

### c. Steuart Walton

Steuart Walton[64] has been a director since June 2016. He is Sam Walton's grandson, Robson's nephew, and Penner's cousin-in-law. The complaint does not plead particularized facts that could support Steuart facing a substantial likelihood of liability for the DEA Settlement Issues, but his familial relationships with Robson and Penner raise a reasonable doubt as to his independence.

---

[63] *See In re Cooper Co., Inc. S'holders Deriv. Litig.*, 2000 WL 1664167, at \*6 (Del. Ch. Oct. 31, 2000) ("The Complaint alleges that director Feghali was interested and/or lacked independence because he was Steven Singer's father in law. That family relationship is sufficient to create a reason to doubt Mr. Feghali's ability to impartially consider a demand."); *Grace Bros., Ltd. v. UniHolding Corp.*, 2000 WL 982401, at \*10 (Del. Ch. July 12, 2000) (Strine, V.C.) (finding reasonable doubt about whether a director impartially could consider a demand adverse to the interests of his brother-in-law); *Harbor Fin.*, 751 A.2d at 889 (granting inference at pleading stage that reasonable doubt existed as to director's ability to consider a litigation demand impartially when the proposed defendant was his brother-in-law). *See generally Chaffin v. GNI Gp., Inc.*, 1999 WL 721569, at \*5 (Del. Ch. Sept. 3, 1999) ("[M]ost parents would find it highly difficult, if not impossible, to maintain a completely neutral, disinterested position on an issue, where his or her own child would benefit substantially if the parent decides the issue a certain way").

[64] To avoid confusion with Robson Walton, this decision refers to Steuart by his first name, without implying familiarity or disrespect.

### d. Doug McMillon

Doug McMillon has worked for Walmart since 1990. He was named Walmart's next CEO in November 2013, when he also became a member of the Board. He took over as CEO on February 1, 2014. After becoming CEO, he joined the Executive Committee. McMillon was thus a senior officer and later CEO during the term of the DEA Settlement. He was a member of the Employee Compliance Committee and frequently attended Audit Committee meetings, including at least five when senior management reported on Health and Wellness compliance.[65]

It is reasonable to infer that McMillon knew about the DEA Settlement. It is also reasonable to infer that McMillon learned about Walmart's compliance issues during the February 2012 Audit Committee meeting, which he attended. Ex. 7. He also attended the Employee Compliance Committee meeting in November 2012, where Harris provided an update on Health and Wellness Compliance projects. Ex. 11 at 2. He attended the two-day September 2013 Board meeting when the Chairman of the Audit Committee reported on the state of compliance efforts, and he received the May 2014 Audit Committee report that showed Walmart was (i) facing ongoing diversion issues, (ii) had experienced a year-over-year increase in incidents of 114%, and (iii) had over one-fourth of its visits from state and federal regulators result in violations. Ex. 49 at 8–9, 10, 64. He was also a director when

---

[65] Ex. 7 at '095; Ex. 43 at '511; Ex. 45 at '203–04; Ex. 48 at '117; Ex. 52 at '181–82.

the June 2014 assessment acknowledged there was no suspicious order monitoring system in place and that the Board had been informed. *See* Ex. D at 4.

For these reasons, McMillon faces a substantial threat of liability on the DEA Settlement Issues and cannot consider a demand. It is also reasonable to infer that McMillon is beholden to the Walton family, because the Walton family controls Walmart, and McMillon's position as CEO depends on pleasing the Walton family. The complaint alleges that McMillon is a "tried-and-true company man." Compl. ¶¶ 4, 70. He has been well-compensated for his service, having made over $150 million as a Walmart executive. *Id.* ¶ 70. Because of his loyalty to the Walton family and his position as CEO, there is reason to doubt whether McMillon could consider a demand to assert claims over the DEA Settlement Issues because of the risk they pose to Walton and Penner.

### e. Steven Reinemund

Steven Reinemund joined the Board in 2010 and retired from the Board effective June 1, 2022. He served on the Strategic Planning and Finance Committee from 2014 to 2017. Unlike the directors considered up to this point, who were either members of the Walton family, insiders, or both, Reinemund was an outside director.

Reinemund served on the Board during the full term of the DEA Settlement. He is thus similarly situated to Walton and Penner in terms of his knowledge about Walmart's degree of compliance with the DEA Settlement. Although he was an outside director and was not a member of the Audit Committee, he otherwise received the same information, made the same decisions, and failed to act in the same manner. He therefore also faces a

90

substantial risk of liability, and there is reason to doubt whether Reinemund could consider a demand.

The court reaches this conclusion reluctantly, because Reinemund is a person of stature who has had an impressive career. He graduated from the United States Naval Academy and served in the Marine Corps, rising to the rank of Captain. After leaving the military, Reinemund enjoyed success in the business world, culminating in the position of Chairman and CEO of PepsiCo from 2001 to 2003. From 2008 to 2014, he served as Dean of the Wake Forest University Business School. In addition to serving as a director at Walmart, he has served on the boards of other major public companies.

Why would an outside director like Reinemund ignore red flags about noncompliance with the DEA Settlement, much less make a conscious decision not to achieve compliance with the DEA Settlement? The answers likely lie in the redacted portions of the documents in Walmart's Section 220 production.

It would not be a stretch to think that the Board received legal advice along the following lines: "The Controlled Substances Act requires substantial compliance, not strict compliance, so the DEA is likely to require only substantial compliance with the DEA Settlement. Walmart has taken some steps to comply with the DEA Settlement and the Controlled Substances Act and has made progress toward compliance. Although the company is not in full compliance and will not achieve full compliance before the DEA Settlement expires, counsel is of the opinion that Walmart has achieved substantial compliance." If Reinemund relied on that type of advice in getting comfortable with

91

Walmart's failure to achieve full compliance with the DEA Settlement, then he could be fully protected under Sections 141(e) of the Delaware General Corporation Law. 8 *Del. C.* § 141(e). To my knowledge, no Delaware decision has addressed reliance on the advice of counsel in the context of an oversight claim, but it seems logical that directors would be fully protected in relying on advice of that sort, absent some blatant and obvious flaw in the advice that would undercut good faith reliance. *Cf. Boardwalk Pipeline P'rs, LP v. Bandera Master Fund LP*, 288 A.3d 1083 (Del. 2022).

At this stage of the case, it is also possible that counsel may have advised the directors that Walmart had not achieved substantial compliance with the DEA Settlement, or that the DEA would require a higher level of compliance, but that the risk of a DEA enforcement action was low. The record shows that both during and after a meeting in November 2014 to discuss the DEA Settlement, the directors made no business decisions and took no action. If the directors consciously decided not to cause Walmart to comply with its legal obligations based on that advice, then they consciously chose a path of noncompliance and acted in bad faith.

Because of Walmart's redactions, the record that might vindicate Reinemund and his fellow directors does not yet exist. The court must draw the plaintiff-friendly inference that Reinemund and his colleagues knew that Walmart was not in compliance with the DEA Settlement, knew that Walmart could not achieve compliance by the time the DEA Settlement terminated, and consciously did nothing to bring Walmart into compliance. Those facts support a claim that Reinemund acted in bad faith. The court is therefore

compelled to conclude that a reasonable doubt exists about Reinemund's ability to consider a demand based on the DEA Settlement Issues.

### f. Timothy Flynn

Timothy Flynn became a director and a member of the Audit Committee in July 2012. He became Chairman of the Audit Committee in June 2014. Flynn served on the Board during the bulk of the term of the DEA Settlement, including the period when Walmart's noncompliance became clear.

Flynn is situated similarly to Reinemund. The only difference is that Flynn joined the Board and the Audit Committee after the 2012 Memo, the Audit Committee meeting where it was discussed, and the Board meeting where the Audit Committee reported on those matters. Otherwise, he and Reinemund received the same information, made the same decisions, and failed to act in similar ways.

Flynn is like Reinemund in another way too. He has had a distinguished career as an accountant and business leader, including serving as CEO of KPMG LLP in the U.S. from 2005 to 2008, and as Charmain of KPMG International from 2007 until 2011. In addition to his service on the Board, Flynn has served as a member of the boards of other major public companies and significant institutions.

As with Reinemund, it is hard to believe that an outside director like Flynn would ignore red flags about noncompliance with the DEA Settlement, much less make a decision not to comply with it. Once again, the answers likely lie in the redacted portions of the documents in Walmart's Section 220 production. Unfortunately, because of Walmart's

compulsive redacting of documents, the pleading-stage record supports an inference that Flynn knew that Walmart was not in compliance with the DEA Settlement, knew that Walmart could not achieve compliance by the time the DEA Settlement terminated, and did nothing to bring the company into compliance. The court is therefore compelled to conclude that a reasonable doubt exists about Flynn's ability to consider a demand based on the DEA Settlement Issues.

## 2. The Conclusion Regarding Demand Futility

The pleading-stage record supports an inference that the foregoing directors could not consider a demand. The strongest precedent for a contrary outcome is *Horman v. Abney*.[66] There, the New York Attorney General launched an investigation into deliveries of unstamped and untaxed cigarettes by United Parcel Services, Inc. ("UPS"). To resolve the investigation, UPS entered into an Assurance of Discontinuance Agreement (the "UPS Agreement") that placed affirmative obligations on UPS to set up policies, programs, and procedures to ensure compliance with New York state law. These measures included "investigating shippers, creating a database of tobacco shippers and sharing that list with the State of New York, auditing the shippers, refusing to ship untaxed cigarettes and imposing progressive discipline against non-compliant shipping customers up to and including a ban on those customers from using any UPS service."[67] UPS also agreed to

---

[66] 2017 WL 242571 (Del. Ch. Jan. 19, 2017).

[67] *Id.* at *3.

94

conduct compliance audits, maintain associated records, implement a "UPS Cigarette Policy," and regularly train its employees on how to ensure enforcement of the policy.[68] One year into the agreement, a UPS compliance officer told the UPS board of directors (the "UPS Board") that UPS had achieved compliance. Years later, the City and State of New York filed suit against UPS in federal court, alleging that UPS had violated the UPS Agreement and state and federal law. The enforcement action sought damages of at least $180 million.[69]

Stockholders of UPS filed a derivative lawsuit that sought to hold the UPS Board liable for breaching their fiduciary duty of loyalty by consciously failing to monitor and manage UPS's compliance with state and federal laws governing the transportation and delivery of cigarettes. Vice Chancellor Slights dismissed the claim under Rule 23.1.

Because *Horman* involved an agreement that bears a resemblance to the DEA Settlement, the dismissal in *Horman* is a natural precedent for the defendants. The facts of *Horman*, however, are distinguishable in multiple ways.

First, the plaintiffs in *Horman* argued that after initially achieving compliance with the UPS Agreement, the UPS Board began to "ignore their oversight responsibilities" to a degree that caused UPS to "operate in violation of the [UPS Agreement] and applicable

---

[68] *Id.*

[69] *Id.* at *5.

state and federal laws governing the shipment of cigarettes."[70] In this case, there was no initial period of compliance. Walmart never achieved compliance. Instead, compliance personnel reported to the Board that Walmart was failing to achieve compliance.

Second, the plaintiffs in *Horman* argued that documents produced in response to their Section 220 demand "reveal an absence of any Board minutes or other Board materials relating to the monitoring of compliance with the [UPS Agreement] from January 1, 2010 to February 12, 2014," and they sought an inference that the defendants "did absolutely nothing to oversee UPS's compliance with the [UPS Agreement] or cigarette laws in any way."[71] In this case, the pleading-stage record shows reports to the Audit Committee and the Board. The question is not whether the Walmart directors engaged in monitoring, but rather whether the directors were put on notice of Walmart's noncompliance with the DEA Settlement. The pleading-stage record supports that inference.

Third, the plaintiffs in *Horman* argued that the UPS Board should have engaged in greater monitoring because of the UPS Agreement. Vice Chancellor Slights held that the UPS Board made a good faith effort to engage in monitoring.[72] Again, the issue in this case

---

[70] *Id.* at *4.

[71] *Id.* at *8.

[72] *Id.* at *9-10.

is not whether the Board engaged in monitoring, but rather whether they ignored red flags or consciously allowed Walmart to violate the law.

Fourth, in *Horman*, Vice Chancellor Slights held that allegations of the complaint did not support an inference that the directors had ignored red flags. The plaintiffs cited the UPS Agreement and three documents that went to the Audit Committee. The Vice Chancellor declined to view the UPS Agreement as a red flag because UPS initially achieved compliance. At the same time, he acknowledged that

> [t]here might well be a reasonably conceivable scenario where the [UPS Agreement] itself could have taken the form of a red flag. For instance, if UPS had entered the [UPS Agreement] in 2005 and then continued a pattern of non-compliant shipments immediately thereafter and through 2014, one might reasonably infer that the Board had consciously disregarded UPS's commitments under the [UPS Agreement] and its own oversight responsibilities.[73]

That is precisely what the pleading-stage record indicates happened in this case.

Turning to the reports to the Audit Committee, Vice Chancellor Slights declined to draw an inference that the materials addressed instances of noncompliance or that the chair of the Audit Committee informed the board about those instances.[74] Citing a case from the U.S. Court of Appeals for the Eighth Circuit, he observed that Delaware courts decline to infer that directors must have known about an issue because someone was supposed to

---

[73] *Id.* at *11.

[74] *Id.* at *12-13.

97

report to them about it.[75] Whether the pled facts support an inference that information was provided depends on the case. The Delaware Court of Chancery has declined to presume that officers or directors necessarily provide information to other directors, but that is not a universally applicable rule.[76] One Delaware decision has drawn an inference that a subset of directors shared information with other directors,[77] and the Delaware Supreme Court has acknowledged that a plaintiff may establish an inference of director knowledge "by establishing that certain . . . officers were in a reporting relationship to [the] directors, that those officers did in fact report to specific directors, and that those officers received key information regarding the [matter at issue]."[78] In this case, the pleading-stage record supports an inference that information flowed from management to the Audit Committee and Executive Committee and from there to the full Board.

Finally, Vice Chancellor Slights declined to infer that the directors in *Horman* consciously approved legal noncompliance by UPS in the pursuit of greater profit. The court declined to credit that inference given the magnitude of the total deliveries that UPS made relative to the number of illegal delivers: "UPS makes more than 18.3 million

---

[75] *Id.* at *13 (citing *Cottrell v. Dukes*, 829 F.3d 983, 988 (8th Cir. 2016)).

[76] *See Desimone*, 924 A.2d at 943.

[77] *Saito v. McCall*, 2004 WL 3029876, at *7 n.68 (Del. Ch. Dec. 20, 2004), *overruled on other grounds by Lambrecht v. O'Neal*, 3 A.3d 277 (Del. 2010)

[78] *Wal-Mart Stores, Inc. v. Indiana Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1273 (Del. 2014) (cleaned up).

package deliveries per day. The Complaint alleges that UPS made approximately 78,000 shipments of illegal cigarettes between 2010 and 2014. This is hardly a ratio that alone would support an inference of bad faith."[79]

This case is different. The pleading-stage record supports the existence of a business plan to drive prescription traffic to Walmart's pharmacies as a means of increasing pharmacy revenue and getting customers into its stores. The record also supports an inference that Walmart incentivized pharmacists to fill prescriptions quickly, set unrealistic goals for the time to fill each prescription, and deprived pharmacists of information that they could use to fulfill their Refusal-To-Fill Obligation. During the same period, Walmart underfunded its efforts to comply with the DEA Settlement. The extent of the pleading-stage record on this subject and the involvement of the directors supports an inference that they knew Walmart was sacrificing compliance for profits.

*Horman* was a very different case. It does not help the defendants here.

Walton, Penner, Steuart, McMillon, Reinemund, and Flynn comprise half of the Demand Board. They could not consider a demand. This decision therefore need not consider whether Marissa Mayer or Thomas Horton could consider a demand. Demand is futile as to claims based on the DEA Settlement Issues

---

[79] *Horman*, 2017 WL 242571, at *14

99

## C. The Pharmacy Issues

The next category of alleged wrongdoing involves the Pharmacy Issues, where the timeframe starts after the DEA Settlement expired in March 2015. Although the court has separated the DEA Settlement Issues from the Pharmacy Issues, that does not mean that the analysis of the Pharmacy Issues starts from a clean state. The day that the DEA Settlement expired did not result in Walmart suddenly being in compliance with the Controlled Substances Act. Instead, the red flags of noncompliance remained unfurled. Walmart was still seeking to drive prescription traffic to its pharmacies to generate sales and get customers into its stores, and Walmart was still not interested in undermining that business plan by making significant investments in compliance. Taken as a whole, the allegations of the complaint support an inference that the directors consciously continued Walmart's business practice of failing to comply with the Controlled Substances Act until the Nationwide Settlement in 2022.

### 1. Director-by-Director Analysis

To render demand futile for the Pharmacy Issues, the plaintiffs must tie the arc of Walmart's noncompliance to a sufficient number of directors to deprive the Demand Board of a disinterested, independent majority. Conducting that inquiry again requires a director-by-director analysis.

#### a. McMillon

For the Pharmacy Issues, the demand futility analysis begins with McMillon, because he became Walmart's CEO in February 2014 and led the company throughout the

relevant period. He was a member of the Employee Compliance Committee and regularly attended their meetings, where compliance issues were discussed. He also frequently attended Audit Committee meetings. It is reasonable to infer that as CEO, McMillon was responsible for the business strategy of increasing traffic at Walmart stores by incentivizing and pressuring pharmacists to fill prescriptions quickly. It is also reasonable to infer that as CEO, McMillon was responsible for the decision to sue the DOJ on the theory that Walmart knew more about compliance than its regulator.

Based on the allegations of the complaint as a whole, it is reasonable to infer that McMillon knew that after the DEA Settlement term expired, Walmart continued its noncompliance with its obligations as a dispenser under the Controlled Substances Act. That said, the first event to take place after the DEA Settlement term expired is helpful to McMillon and the defendants. At meetings in February 2015, approximately one year after the DEA Settlement expired, the Audit Committee and the Board reviewed Walmart's compliance objectives for fiscal year 2016 and approved an effort to enhance its suspicious order monitoring system. Management's proposal suggested an effort to comply with one aspect of the Controlled Substances Act.

But then came the barrage of lawsuits in 2016 and 2017 and the news in December 2016 that the U.S. Attorney's Office for the Eastern District of Texas was conducting a criminal investigation into Walmart's pharmacies. In November 2017, management reported to the Audit Committee and the Board about compliance problems in the Health and Wellness Division. Viewed collectively and evaluated at the pleading stage, those

101

events negate the positive impact of the decisions made in February 2015 and support an inference that Walmart was still not complying with its legal obligations.

Whether allegations about investigations, subpoenas, and lawsuits rise to the level of red flags "depends on the circumstances." *Fisher v. Sanborn*, 2021 WL 1197577, at *12 (Del. Ch. Mar. 30, 2021). "A settlement of litigation or a warning from a regulatory authority—irrespective of any admission or finding of liability—may demonstrate that a corporation's directors knew or should have known that the corporation was violating the law." *Rojas v. Ellison*, 2019 WL 3408812, at *11 (Del. Ch. July 29, 2019). When considering an avalanche of lawsuits against another defendant in the Opioid MDL, this court held that the lawsuits "put the directors on notice of problems at the Company. The directors did not just see red flags; they were wrapped in them." *Collis Demand Decision*, 2022 WL 17841215, at *16. The same reasoning applies here.

It is reasonable to infer that McMillon and the other directors knew about the red flags from the avalanche of lawsuits. Not only that, but McMillon attended an Audit Committee meeting on November 2, 2017 when Jorgensen and other executives reported on Health and Wellness compliance issues. Ex. 60 at 4. McMillon also attended the Board meeting the next day, when Flynn as Chair of the Audit Committee reported to the full Board. Ex. 61 at 15–16.

The next question is whether McMillon and his fellow directors consciously disregarded their obligations to respond to the red flags. Here again, McMillon and his fellow directors were not *completely* inactive, because the directors scheduled an education

102

session about the opioid crisis for December 2017. But that event is ultimately not helpful to McMillon and the directors at this stage, because Walmart withheld or redacted everything about the director education session. Walmart's withholding of those documents constitutes a representation that after a briefing on the opioid crisis, the directors did not consider a single business issue, engage in any business discussions, or make any business decisions.

After that, there is no indication that the directors took any action to address compliance issues at its pharmacies until May 2018, when the U.S. Attorney's Office for the Eastern District of Texas threatened to criminally indict Walmart for its role in the opioid crisis. As CEO, McMillon necessarily knew about that threat, and it is reasonable to infer that McMillon led the response.

From a compliance standpoint, Walmart amended its pharmacy operating manual. Rewriting procedures and creating new documents is relatively easy. That was what Walmart did in response to the Order To Show Cause in 2009, and it's what Walmart did again in response to the indictment threat. The new manual detailed a number of prescriber and patient red flags for pharmacists to consider. Walmart also issued a press release in which the company promised that within the next sixty days, it would restrict initial acute opioid prescriptions to no more than a seven-day supply. Ex. H. Walmart could have taken that step years before, in 2014, when the Audit Committee saw the photograph showing a Walmart pharmacy with scores of patrons waiting in line at 7:00 a.m., two hours before the pharmacy opened, to fill their prescriptions for Oxycodone. Rather than suggesting that the

Walmart directors were responding appropriately to a massive red flag, the belated action reinforces the inference that Walmart's directors and officers had not been engaging in good faith efforts to comply with the law.

Further supporting that inference, Walmart only took another incremental step toward compliance in July 2018, after failing to negotiate a settlement with the U.S. Attorney's Office. At that point, the Board adopted a policy under which pharmacists could access the refusal-to-fill information in Walmart's pharmacy management system. Walmart could have given the pharmacists access when it implemented the Archer system in 2015, but that would have resulted in pharmacists using the data and taking more time to fill prescriptions. They also likely would have rejected some prescriptions based on the information they saw. That was not good for Walmart's bottom line. Walmart wanted pharmacists filling prescriptions quickly. The belated granting of access to that information further reinforces the inference that Walmart's directors and officers had not been engaging in good faith efforts at compliance.

Walmart's most effective strategy was to contact its friends in Washington and convince the bigwigs at the DOJ to quash the indictment. It is reasonable to infer that one of the reasons that the DOJ quashed the indictment was Walmart's agreement to have a former DOJ Associate Attorney General, whom Walmart had hired as its Executive Vice President of Global Governance, conduct an internal investigation. *See* Ex. 71. It is reasonable to infer that McMillon signed off on the hiring of the new Executive Vice President and the plan to conduct an internal investigation. It is reasonable to infer that

McMillon monitored the progress of the investigation, because he attended Audit Committee meetings in April, May, and July 2018 where the committee received reports on that topic. McMillon also attended the full Board meeting in November 2019 where the directors received a final report. *See* Exs. 71–74.

In the abstract, having a distinguished former prosecutor conduct an internal investigation is a good thing. But at this stage of the case, the court cannot draw any inferences from that effort, because Walmart redacted or withheld everything about the investigations based on the attorney-client privilege or work product doctrine. Because Walmart withheld everything, the court must infer that the investigation did not result in any business decisions by McMillon or his fellow Walmart directors or any changes in Walmart's business practices. The plaintiffs are entitled to an inference that Walmart continued engaging in the noncompliant practices that had led to the thousands of suits that were consolidated in the Opioid MDL and that had caused the U.S. Attorney for the Eastern District of Texas to threaten to criminally indict the company.

In October 2020, Walmart sued the DOJ. That was a major move that McMillon necessarily approved. At this stage of the proceedings, it is reasonable to infer that the decision to sue the DOJ was an effort to deflect attention away from Walmart's own violations of the Controlled Substances Act. In that lawsuit, Walmart sought declarations validating the practices it had followed and rulings in its favor on many issues that Walmart had lost in the Opioid MDL. Like the defendants in *Massey*, Walmart was claiming that it knew more about compliance than its regulators. *Massey*, 2011 WL 2176479, at *21.

105

Jury findings rendered in 2021 in the Opioid MDL provide further support for the inference that, under McMillon's leadership, Walmart did not change its policies and continued violating the law. In a recent decision, this court considered findings of fact made by a federal court when evaluating the strength of a plaintiffs' allegations regarding illegal conduct. *See Collis Demand Decision*, 2022 WL 17841215, at *3. There, the plaintiffs had alleged facts that would have supported a Red-Flags Claim and a *Massey* Claim against the directors of an opioid distributor, except for post-trial factual findings by the U.S. District Court for the Southern District of West Virginia. After a two-month trial, during which seventy witnesses testified either live or by deposition, that court held that the distributor had not violated their anti-diversion obligations. In light of those findings, the plaintiffs' allegations could not support a reasonable inference of noncompliance. *Id.* at *17, 19.

For Walmart, the situation is reversed. In November 2021, a jury in the bellwether case of the Opioid MDL found that Walmart engaged in "improper dispensing conduct" as "evidenced by [its] systemic failures to investigate and resolve red-flag prescriptions"; "dispensed massive quantities of red-flagged prescriptions without taking adequate measures to investigate or otherwise ensure the prescriptions were appropriately dispensed"; and "dispensed opioids without having in place effective controls and procedures to guard against diversion—controls and procedures they knew were required and knew they had not adequately employed." *Opioid MDL Abatement Decision*, 2022 WL 3443614 at *4, *30, *32.

106

In denying Walmart's motion for judgment as a matter of law notwithstanding the verdict, the federal judge presiding over the Opioid MDL found that "Walmart knew it was required to resolve red flags before dispensing opioids," and "[d]espite this knowledge, there was evidence that Walmart knew it did not have sufficient policies in place to ensure compliance." *In re Nat'l Prescription Opiate Litig.* (*Opioid MDL JNOV Ruling*), 589 F. Supp. 3d 790, 804 (N.D. Ohio 2022). The judge determined that "a jury could reasonably conclude that [Walmart] intentionally dispensed opioids under circumstances which it knew or was substantially certain would interfere with public health or public safety." *Id.* at 806.

As part of the remedy against Walmart, the federal judge issued an injunction requiring Walmart to adopt substantially compliant reforms to remediate deficient controls and reporting systems under the Controlled Substances Act. *Opioid MDL Abatement Decision*, 2022 WL 3443614, at *32. The court explained that "[t]he evidence at trial" showed that Walmart "failed at these tasks of resolution / documentation / rejection of suspicious prescriptions," and he entered an injunction requiring that Walmart carry out those tasks. *Id.* at *37. It is reasonable to infer from the court's order that Walmart's controls and reporting systems were not in compliance with the Controlled Substances Act.

And that is not all. In November 2022, Walmart agreed to implement extensive procedures and controls as part of the Nationwide Settlement. Although Walmart denied any liability, it is reasonable to infer that before the Nationwide Settlement, similar procedures were not in place, because otherwise the changes could not have been part of

107

the consideration for the settlement. It is also reasonable to infer that Walmart did not fix its compliance problems until it entered into the Nationwide Settlement, which provided its directors and officers with a broad release.

McMillon was at the helm throughout this period. It is reasonable to infer that he faces a substantial threat of liability on the Pharmacy Issues and therefore cannot consider a demand.

### b.    Walton

The next director is Walton, who served as Chairman of the Board until June 2015, when Penner succeeded him. He remained a director after giving up the chairmanship. He was thus a director throughout the relevant period for the Pharmacy Issues.

Walton was a director during the onslaught of lawsuits in 2016 and 2017. He was a director in December 2016, when Walmart learned that the U.S. Attorney's Office for the Eastern District of Texas was conducting a criminal investigation into Walmart's pharmacies. He was present at the Board meeting in November 2017 when the Audit Committee reported on the compliance issues associated with the Opioid MDL, and he attended the director education session in December 2017. That was the meeting when the directors learned about the opioid crisis and yet engaged in no non-privileged discussions of business issues and made no non-privileged business decisions. The plaintiffs are entitled to a pleading-stage inference that in the face of powerful evidence of noncompliance, Walton and his fellow directors did nothing.

108

Walton was a director in 2018 when the U.S. Attorney for the Eastern District of Texas threatened to criminally indict Walmart. He was a director when Walmart crafted its response. He was also a director when Walmart sued the DOJ, evidencing a belief that it knew more about compliance than its regulators.

Walton was a director in 2021 when the jury in the Opioid MDL ruled against Walmart. And he was a director in 2022 when the federal judge issued an injunction against Walmart. He was also a director when Walmart entered into the Nationwide Settlement.

Based on the events that took place between 2016 and 2022, it is reasonable to infer that Walton faces a substantial risk of personal liability for having acted in bad faith. During that period, Walton was presented with extensive evidence that Walmart was failing to comply with its legal obligations under the Controlled Substances Act, yet the pleading-stage record supports an inference that he and the other directors did not take action to fix Walmart's compliance problems until Walmart entered into the Nationwide Settlement that provided its directors and officers with a release.

### c. Penner

Penner was a director throughout the period covered by the Pharmacy Issues. He succeeded Walton as Chairman in 2015, and he joined the Executive Committee in 2016. All of the reasons that Walton faces a substantial likelihood of liability apply equally to Penner. In addition, as with the DEA Settlement Issues, Penner is not disinterested regarding the Pharmacy Issues because of his familial connections to Walton.

109

### d. Steuart

Steuart became a director in 2016, early in the period covered by the Pharmacy Issues, at a time when Walmart faced the deluge of lawsuits that became the Opioid MDL, and shortly before Walmart learned that the U.S. Attorney's Office for the Eastern District of Texas was conducting a criminal investigation into its pharmacies. All of the reasons why Walton and Penner face a substantial likelihood of liability apply equally to Steuart. As with the DEA Settlement Issues, Steuart also is not disinterested regarding the Pharmacy Issues because of his familial connections to Walton and Penner.

### e. Flynn

Flynn was a director and Chair of the Audit Committee throughout the period covered by the Pharmacy Issues. All of the reasons that Walton, Penner, and Steuart face a substantial likelihood of liability apply equally to Flynn. In addition, as Chair of the Audit Committee, Flynn was more deeply involved in the compliance issues that management identified in November 2017 and the internal investigation that Walmart conducted in 2018 and 2019. Walmart redacted or withheld everything about the investigations on the basis of the attorney-client privilege and the work product doctrine, so the court must infer that the investigation did not result in any business decisions by Flynn or other Walmart directors and no changes in Walmart's business practices.

For Flynn, the Pharmacy Issues create the same conundrum as the DEA Settlement Issues, because it is again hard to believe that an outside director like Flynn would ignore red flags about noncompliance with the Controlled Substances Act or endorse conscious

110

noncompliance. As before, the answers likely lie in the redacted portions of the documents in Walmart's Section 220 production. Unfortunately, because of Walmart's redaction practices, the pleading-stage record supports an inference that Flynn knew that Walmart was not in compliance with the Controlled Substances Act and did not make a good faith effort to bring the company into compliance until the Nationwide Settlement. The court is therefore compelled to conclude that a reasonable doubt exists about Flynn's ability to consider a demand based on the Pharmacy Issues.

### f. Thomas Horton

For purposes of the DEA Settlement issues, this decision did not consider Horton. In lieu of considering whether Reinemund could consider a demand to assert claims over the Pharmacy Issues, this decision examines Horton, because he was both a director and member of the Audit Committee throughout the relevant period.

Like Reinemund and Flynn, Horton is a distinguished individual who has achieved great success in business. From 2011 to 2013, Horton served as Chairman, President, and CEO of American Airlines, Inc. and its parent corporation, AMR Corp. From 2013 to 2014, Horton served as Chairman and CEO of American Airlines Group, Inc., which became the world's largest airline as a result of the merger of AMR and US Airways.

Because of his term of service and membership on the Audit Committee, all of the reasons why Flynn faces a substantial likelihood of liability apply equally to Horton. The same caveats about Horton ignoring red flags and consciously condoning violations of law also apply. Nevertheless, given the pleading-sage record, the court must draw an inference

that there is reason to doubt Horton's ability to consider a demand because of a substantial threat of liability on the Pharmacy Issues.

### 2. The Conclusion Regarding Demand Futility

McMillon, Walton, Penner, Steuart, Flynn, and Horton comprise half of the Demand Board, rendering demand futile as to the Pharmacy Issues. This decision does not consider whether Mayer or Reinemund could consider a demand regarding the Pharmacy Issues.

## D. The Distributor Issues

The final category of alleged wrongdoing involves the Distributor Issues. This category of alleged wrongdoing predated the DEA Settlement, then continued until April 2018, when Walmart completed its exit from the business. Walmart's obligations as a distributor were not affected by the DEA Settlement, which only addressed Walmart's duties as a dispenser.

The complaint supports an inference that Walmart failed to comply with its obligations as a distributor, including by chronically violating both the Reporting Requirement and the Shipping Requirement. According to the complaint:

- Before November 2010, Walmart had no written policies or procedures in place to govern monitoring for suspicious orders in its distribution business. Walmart relied on untrained employees, operating without any guidance, to bring orders to management's attention if something did not seem right.

- Starting in November 2010, Walmart implemented a policy that contemplated having employees at the Bentonville distribution center review a monthly report, identify any orders for controlled substances that constituted more than 3.99% of a single pharmacy's total drug purchases during the prior month, and send the reports to the appropriate Drug Diversion Coordinator. The November 2010 policy did not identify other criteria that could render an order suspicious, and the Section 220

112

production is devoid of guidance about what the Drug Diversion Coordinator was supposed to do.

- From 2011 until 2015, Walmart implemented a cutback system that flagged orders that exceeded hard limits. Walmart shipped the orders up to the limits, then referred the excess orders to another distributor to ship the balance.

- In 2014, a consulting firm proposed to modify the Reddwerks system that Walmart was using so the tool could do more than just implement the hard limits. The modifications would have cost $185,000. Walmart rejected the proposal.

Those allegations support an inference that Walmart violated its legal obligations.[80]

What the plaintiffs have failed to do is tie those allegations to the members of the Demand Board. The complaint alleges that shortly after November 2010, when Walmart implemented its initial policy about reviewing reports for orders that exceeded 3.99% of a pharmacy's total drug purchases during the prior month, management briefed the Executive Committee and the Audit Committee on the policy. Compl. ¶ 141. The complaint's allegations do not support an inference that the directors knew that the policy failed to comply with Walmart's obligations as a distributor, nor that it would have constituted a red flag that Walmart was violating the law.

Walmart's use of the cutback system seems like a blatant violation of both the Controlled Substances Act and Walmart's own policy regarding suspicious orders. But the

---

[80] *Accord Opioid MDL SJ Decision*, 2020 WL 425965, at *2 ("Walmart argues Plaintiffs cannot show its opioid distributions substantially caused their alleged injuries. . . . Plaintiffs have produced evidence upon which a jury could reasonably conclude Walmart's distribution activities caused Plaintiffs' alleged injuries.").

plaintiffs have not shown that any member of the Demand Board knew about the cutback system.

The complaint also alleges that in February 2015, Walmart's Global Chief Compliance Offer informed the Audit Committee that Walmart was undertaking an initiative to "implement controlled substance suspicious-order monitoring enhancements (which include both software and personnel changes) in the U.S. distribution centers." Ex. 51 at '002. That information would have been reassuring for the directors. It would not have suggested that Walmart was failing to comply with its obligations as a distributor, nor constitute a red flag that Walmart was violating the law. Both the Audit Committee and the Board signed off on the plan to move forward with the enhancements. *See* Compl. ¶¶ 228–233.

The barrage of legal actions that Walmart faced during 2016 and 2017 included claims based on its role as a distributor. As with the Pharmacy Issues, those lawsuits were a crimson flag, but management responded. In November 2017, Walmart management made the decision to stop acting as a distributor of prescription opioids and wound down that business, with the exit completed in April 2018. The Audit Committee learned that Walmart had exited from the business in September 2018.

It is reasonably conceivable that between the beginning of the onslaught of lawsuits and September 2018, Walmart's directors should have done something about the distribution business. But the plaintiffs have not alleged particularized facts regarding what the directors should have done or failed to do during this period. Not only that, but

114

management began winding down the distribution business in November 2017. The plaintiffs would have to explain what causally related harm resulted from the directors not taking action before the management team did.

In a last-ditch effort, the plaintiffs argue that the decision to exit the opioid distribution supports a reasonably conceivable inference that the Board "never attempted to bring Walmart's distribution operations into compliance with [the Controlled Substances Act]." Compl. ¶ 269; *see also id.* ¶ 270 ("The fact that Walmart would rather pay for distribution from third parties, rather than bring its distribution facilities into CSA compliance, underscores how broken the status quo was (and had been for years)."). How does that allegation translate into a claim? Walmart exited the business and ended its noncompliance. That Walmart did so by paying for third-party distribution does not alter the fact that Walmart took action to address its compliance failures. The plaintiffs have not alleged that Walmart continued violating the Controlled Substances Act by using third-party distributors. By exiting the business, the officers made a protected business judgment. *See, e.g.*, *McDonald's Directors*, 2023 WL 2293575, at \*17 ("When making those decisions [about which risks to monitor], officers and directors are presumed to act loyally, in good faith, and with due care (*i.e.*, on an informed basis). Unless one of those presumptions is rebutted, the decision is protected by the business judgment rule.").

The plaintiffs thus have failed to allege facts supporting a claim regarding the Distributor Issues that could result in a substantial risk of liability for any of the members of the Demand Board. The plaintiffs have not pled facts that would support a Red-Flags

115

Claim or a *Massey* Claim. There might be the makings of an Information-Systems Claim, but the plaintiffs would have to deal with the reports to the Board in November 2010 and February 2015.

Perhaps the plaintiffs could have pled a viable Information-Systems Claim by arguing that the defendants had an obligation to develop a board-level reporting system with systematized procedures that reflected a good faith effort to bring to the Board's attention instances of illegality or criminality in the opioid distribution operation. Although it is difficult to make an assessment based on the highly redacted documents in the pleading-stage record, there are indications that Walmart's compliance reports were less focused on surfacing incidents of illegal or criminal conduct and more geared to providing positive readouts about training programs, policies, and procedures, and other compliance success stories.

Scholars have suggested that well-intended compliance programs can become Panglossian protective devices, while the business leaders with P&L responsibility relentlessly respond to key metrics, promotion criteria, compensation programs, and corporate cultures that emphasize profits over compliance.[81] Some scholars have argued

---

[81] *See, e.g.*, John Armour et al., *Taking Compliance Seriously*, 37 Yale J. on Reg. 1, 20–31 (2020) (modeling how stock-based pay gives managers incentives to underinvest in compliance); Donald C. Langevoort, Caremark *and Compliance: A Twenty-Year Lookback*, 90 Temp. L. Rev. 727, 739–40 (2018) (discussing why "[i]t is a difficult managerial task to simultaneously drive profits and growth while preserving a strong sense of compliance" given that "the former is directly rewarded via raises and promotions and

that to address this problem, the Delaware courts should make clear that oversight is not exclusively about agency costs; instead, "the aspect of good faith that is focused on legal compliance also, or perhaps primarily, serves a public purpose and legitimizing role for corporate law."[82]

Under that model, the key measure of an information system would be the extent to which it brings actionable and timely information about illegality or criminality to the attention of the board so that the directors can investigate and terminate misconduct and provide information to enforcement officials.[83] Delaware courts would not merely sign off on the existence of an information system, but would look to whether the information system reflected a good faith effort to achieve that goal. Having such a focus would provide a unifying orientation for an Information-Systems Claim, just as the fiduciary goal of maximizing the long-term value of the corporation for the ultimate benefit of its stockholders provides a polestar when evaluating fiduciary decision-making.

---

the latter more through exhortations and soft praise"). *See generally* Donald C. Langevoort, *Selling Hope, Selling Risk* 35–45 (2016) (discussing the causes of corporate fraud).

[82] Elizabeth Pollman, *Corporate Oversight and Disobedience*, 72 Vand. L. Rev. 2013, 2027 n.73 (2019).

[83] *E.g.*, *Principles of the Law, Compliance and Enforcement for Organizations* § 5.18 (Am. L. Inst. 2021); Jennifer Arlen, *Evolution of Director Oversight Duties and Liability under* Caremark: *Using Enhanced Information-Acquisition Duties in the Public Interest* (Feb 2023); Jennifer Arlen, *The Story of* Allis-Chalmers, Caremark, *and* Stone at 326–27, 344, *in Corporate Stories* (2009).

While the policy rationale for that step makes sense, how to implement it is unclear, because it would involve the court evaluating at least one dimension of the effectiveness of a compliance program, rather than deferring to the directors' business judgment. True, the analysis of an Information-Systems Claim would be more targeted, because compliance system components like policies and procedures, employee training, whistleblower hotlines, and the like would have reduced significance for the fiduciary claim. They would remain important to the overall health of the organization and for purposes of the Organizational Sentencing Guidelines, but the focus of the Information-Systems Claim would narrow to whether the system was designed to bring information about illegality and criminality to the board's attention. That inquiry could risk becoming a check-the-box exercise, because if the board required management to provide regular reports and followed through on receiving them, then that dimension of the oversight obligation would be satisfied. But the proponents of the model view that as a feature, because once the information reaches the board, the oversight rubric shifts to a Red-Flags Claim or a *Massey* Claim with an attendant impetus for the directors to take remedial action. Driving adverse information to the board-level thus becomes the mechanism for improved compliance. This decision provides no opportunity to explore those issues.

The plaintiffs lack a comprehensible theory of how the Walmart directors acted in bad faith regarding the Distributor Issues. It is therefore not necessary to conduct a director-by-director analysis. Demand is not futile as to the Distributor Issues and the claims relating to those issues are dismissed.

## E. The Officer Defendants' Motion To Dismiss

The plaintiffs have sued Jorgensen and Harris, who served as compliance officers during the actionable period. Both have moved to dismiss under Rules 23.1 and 12(b)(6). For purposes of the Distributor Issues, Rule 23.1 is dispositive. Just as demand is not futile for the directors, it is not futile for the officers. For purposes of the DEA Settlement Issues and the Pharmacy Issues, the converse is true. Just as the Demand Board cannot consider whether to assert claims based on those issues against the director defendants, they likewise cannot consider whether to assert claims based on those issues against the officer defendants, because if Walmart were to proceed against the officer defendants, then the claims could implicate the directors themselves.

The Rule 12(b)(6) motion does not provide an independent basis for dismissal. The officers argued that they did not owe oversight duties, but this court has resolved that issue against them. *See McDonald's Officers*, 289 A.3d at 378–79. The officer defendants were Walmart's principal compliance officers while the DEA Settlement was in effect and later when Walmart was confronting the Pharmacy Issues. It is reasonably conceivable that they failed to take the steps necessary to cause Walmart to comply with the DEA Settlement and with the Controlled Substances Act and that they did not make a sufficient effort to report to the Board regarding Walmart's shortcomings. The complaint states facts supporting claims against the Officer Defendants for both the DEA Settlement Issues and the Pharmacy Issues.

119

**F.     Next Steps**

The defendants have asked for a stay of this case if the court does not dismiss it entirely. The defendants want the case stayed pending the outcome of the DOJ Action.

This court has "inherent power to manage its own docket, including the power to stay litigation on the basis of comity, efficiency, or simple common sense."[84] The request for a stay is not based on a prior-filed action under *McWane* and its progeny. The argument is rather that we should find out how the DOJ Action ends before this action proceeds. If the DOJ Action results in further harm to Walmart, then this action could be a vehicle for remedying it. And if the DOJ Action results in factual findings, those findings may be persuasive and assist in simplifying the case. *See Collis Demand Decision*, 2022 WL 17841215, at *3 (treating federal court's findings on related issues as persuasive).

A stay is not warranted. The DOJ Action is itself stayed pending the outcome of two appeals to the Supreme Court of the United States. The plaintiffs can pursue their liability theories independently of the DOJ Action. The outcome of the DOJ Action may affect the quantum of damages, but it will not affect the parties' ability to litigate the question of liability.

---

[84] *Paolino v. Mace Sec. Int'l, Inc.*, 985 A.2d 392, 397 (Del. Ch. 2009); *see Salzman v. Canaan Cap. P'rs,* 1996 WL 422341, at *5 (Del. Ch. July 23, 1996) ("To enable courts to manage their dockets, courts possess the inherent power to stay proceedings."); *Phillips Petroleum Co. v. ARCO Alaska, Inc.*, 1983 WL 20283, at *4 (Del. Ch. Aug. 3, 1983) (granting stay in favor of pending arbitration based on "common sense").

To further facilitate the orderly progression of this case, the court will bifurcate the issues of liability for breach of fiduciary duty from the issues of causally related damages. The federal district court took the same approach in the Opioid MDL by holding a separate trial on liability before fashioning remedies. Bifurcation will promote efficiency because if there is no breach, then there will not be any need to reach the question of causally related damages. This approach will also provide time for the DOJ Action to resume and proceed to trial so that any harm that Walmart suffers as a result of the DOJ Action can be taken into account during the remedial phase. If a stay of the case is warranted to allow the DOJ Action to reach completion, then the case can be stayed after the issue of liability has been determined.

## III. CONCLUSION

The defendants' motion to dismiss under Rule 23.1 is denied as to the DEA Settlement Issues and the Pharmacy Issues. The motion is granted as to the Distributor Issues. The officer defendants' motion to dismiss is granted as to the Distributor Issues and denied as to the DEA Settlement Issues and the Pharmacy Issues. The case will not be stayed. Proceedings will be bifurcated, with the parties initially litigating the issue of liability.